MORTON ADAMS *vs.* EAST BOSTON COMPANY.
JOHN C. WATSON *vs.* SAME.

Suffolk. March 1, 1920. — June 5, 1920.

Present: RUGG, C. J., BRALEY, CROSBY, CARROLL, & JENNEY, JJ.

*Contract,* Validity. *Corporation,* Officers and agents. *General Court. Agency,* Agent improperly influencing legislation, Compensation.

Where the facts are not in dispute, the question, whether a contract is unenforceable because contrary to public policy, is a question of law under all the circumstances of the particular case.

The directors of a corporation owning a very large tract of marsh lands and flats covered by tide water in close proximity to the main ship channel of Boston Harbor, which under suitable development could be filled and adapted for the construction of docks and for other commercial purposes, well known that no private purchaser of the property ever could be obtained, authorized its president and its treasurer "to take any and all such measures as they may deem advisable for the purpose of effecting a sale or other disposition of any part or parts of the" property, including a taking thereof by public authorities by eminent domain, they to be given a commission of fifteen per cent in addition to their salaries as officers. Through the efforts of these agents in bringing the matter before public men and public organizations, the matter was brought to the attention of the Legislature and St. 1895, c. 291, was enacted, providing for a board of dock and terminal facilities, whose report was filed in January, 1897. Previous to the election of the Legislature of 1897, the agents conducted a systematic campaign to reach members elect of the House of Representatives not only to pledge them to support a bill favoring a taking of the property by the Commonwealth, but also to vote for a speaker whom they suggested or represented to be favorable to the bill and who also would have the power to appoint a committee in the House, to which the bill and the report of the board would be referred and whose members would be inclined to consider favorably the question of public ownership of the property. By authority of a vote of the directors, upon which neither of the agents voted and which afterwards was ratified by a vote

of the stockholders, a contract in writing was made by the corporation with the agents under date May 21, 1897, providing for the same commission as that previously specified to be paid to the agents "in compensation for their services rendered and to be rendered in connection with the sale" of the property, the agents agreeing to "use their best efforts . . . to dispose of said" property, and to accept the stipulated commission "as full compensation for their services under this agreement and for like services previously rendered at the request of, or by agreement with, the directors of the company." Twenty days later St. 1897, c. 486, was enacted, under the authority of which the board of harbor and land commissioners took the property in question by eminent domain. An amount later having been paid by the Commonwealth for the property, the agents brought actions against the corporation for their commissions, in which it was *held*, that

(1) The contract dated May 21, 1897, was not invalid on its face;

(2) The contract provided for payment to the plaintiff for services rendered in the use of improper influence upon members of the Legislature to whom the proposed statute was to be presented, and therefore was unenforceable because contrary to public policy;

(3) It is of no consequence that eventually there was no actual harm to the public in the passage of the statute, it being sufficient that the contract, when applied to the facts, inevitably tended to results which impaired not merely the character of the Legislature,. but also the public confidence in its integrity.

TWO ACTIONS OF CONTRACT, upon the agreements in writing described in the opinion, for compensation for services alleged to have been performed by one Charles E. Adams (the assignor of the plaintiff in the first action) and by the plaintiff in the second action relating to the procuring by the defendant of compensation for certain lands and flats taken by the Commonwealth by eminent domain. Writs dated September 22, 1916.

In the Superior Court the actions were tried together before *White*, J. It appeared that the defendant's directors on October 4 and November 1, 1894, and on February 6, 1896, previous to the authorization and making of the first contract described in the opinion, voted that John C. Watson and Charles E. Adams, be "authorized to take any and all such measures as they may deem advisable for the purpose of effecting a sale or other disposition of any part or parts of the" land and flats in question, their compensation being fixed in the vote of October 4, 1894, at ten per cent and in the vote of February 6, 1896, at fifteen per cent commission, and to be in addition to any salary paid them as president and treasurer. The vote of November 1, 1894, specifically provided that the "vote dated October 4, 1894, relating to compensation . . . in case a sale . . . shall be effected was intended to include

and apply to any disposal thereof by the taking of said flats by any public authority by exercising the right of eminent domain."

Thereafter, largely through the efforts of Watson and Adams in bringing the question before public men and public organizations, hearings were had in the Legislature and St. 1895, c. 291, was enacted, providing for the appointment of a board of dock and terminal facilities. This board reported in January, 1897.

Other material evidence is described in the opinion. At the close of the evidence, the defendant moved that a verdict be ordered in its favor. The motion was denied. The defendant then asked, among others, for the following rulings:

"6. The alleged contract of May 21, 1897, a copy of which is annexed to the declaration . . . was invalid because it was contrary to public policy.

"7. The alleged agreement of modification of the contract of May 21, 1897, a copy of which is annexed to the declaration . . . was invalid because it was contrary to public policy.

"8. The evidence will not warrant a finding by the jury that the alleged agreement of January 23, 1900, a copy of which is annexed to the declaration . . . was made in good faith and with such regard for the interests of the defendant company on the part of its directors and officers as to make it a binding contract of the company."

"20. If the plaintiffs, or either of them, sought through personal solicitation or request, by letter or otherwise, to persuade any member of the State Legislature to support legislation which would authorize the harbor and land commissioners to purchase or take by eminent domain any of the defendant's flats, the plaintiffs cannot recover in this action.

"21. If the plaintiffs, or either of them, sought through personal solicitation or request, by letter or otherwise, to persuade the board of harbor and land commissioners or any member of said board to act in favor of a taking of the defendant's flats by eminent domain, then the plaintiffs cannot recover in this action."

The rulings were refused. The jury found for the plaintiff in each action in the sum of $14,398.46; and the defendant alleged exceptions.

*G. L. Mayberry,* (*L. A. Mayberry* with him,) for the defendant.
*W. A. Dane,* (*F. Hoitt* with him,) for the plaintiffs.

BRALEY, J. The alleged cause of action rests on the contracts copies of which, annexed to the declaration, in so far as material read as follows:

The first contract: "Said Company agrees to pay to said John C. Watson and Charles E. Adams in compensation for their services rendered and to be rendered in connection with the sale of its flats and marsh lands, and in addition to the salaries paid to them as officers of the Company, fifteen (15) per cent of the proceeds of any sale or sales consummated before January 1st, 1900, but all other commissions and expenses incurred in connection with said sale shall be paid out of said fifteen per cent and deducted therefrom.

"Said Watson and Adams in consideration of the foregoing agreement agree to use their best efforts during said period to dispose of said marsh lands and flats, and to accept said commission as full compensation for their services under this agreement and for like services previously rendered at the request of, or by agreement with, the directors of the Company.

"No sale shall be deemed to be consummated within said period within the meaning of this agreement unless a written contract therefor has been entered into by the corporation with a responsible party or parties, and no such contract shall be made on behalf of the corporation except by vote of the directors. But if at the expiration of said period negotiations for a sale are going on and if through the efforts of said Watson and Adams said sale, for which negotiations were going on as aforesaid, is consummated prior to January 1, 1901, they shall be entitled to a commission as aforesaid thereon.

"In case a sale is consummated upon which said Watson and Adams are entitled to commissions, but payment is postponed or delayed, the commissions of said Watson and Adams shall not be payable upon any part of the purchase money until such part of the purchase money is received by the corporation.

"In case any of the marsh lands or flats included in this agreement should be taken by right of eminent domain prior to January 1, 1900, said Watson and Adams shall be entitled to a commission as aforesaid on all sums received by the corporation on account of said taking when such sums are received.

"One-half of said commission of fifteen (15) per cent shall be paid to each of said parties, his representatives or assigns."

The second contract: "Whereas the Commonwealth, by action of the Board of Harbor and Land Commissioners, has taken a portion of the flats belonging to East Boston Company as contemplated in and by the vote of this Board dated May 8th, 1899, amended by vote of Nov. 2, 1899, and the contract pursuant to said vote of May 6th with John C. Watson and C. E. Adams and said Board has made an award of damages for such taking that said Company deems inadequate and that is not satisfactory and said Company has petitioned the Superior Court for a revision of such award and to ascertain and fix the damages for such taking, whereby the East Boston Company incurs and becomes liable to pay the charges, costs and expenses of litigation in prosecuting said petition not contemplated by said vote and contract, therefore

"Voted, That in consideration of the premises it is hereby agreed by and between the said Watson and Adams and this corporation that the rate of compensation which they are entitled to receive according to and on account of said taking of said portion of said flats be and is hereby altered and reduced from fifteen per cent of the amount which the East Boston Company shall receive for said taking to ten per cent of such amount.

"And Mr. George B. James is hereby authorized and instructed to execute for and in the name of East Boston Company an agreement with the said Watson and Adams in accordance with this vote and to be executed also by them."

The first agreement is dated May 21, 1897, and although the second agreement is undated, the record shows that it was executed shortly after January 23, 1900.

The parties plaintiff will be referred to as if the action first named had been brought in the name of Charles E. Adams, who assigned his claim to Morton Adams for whose sole benefit it is prosecuted, and the contract will be considered as the agreement shown by the first instrument, for the second instrument, while affirming the agreement, relates to the modification of the commission.

The defendant owned a very large area or tract of marsh lands and flats covered by tide water in close proximity to the main ship channel of the harbor of Boston, which under suitable development could be filled and adapted for the construction of docks and other commercial purposes. The company under previous arrange-

ments with the plaintiffs had endeavored to sell but no purchaser appears to have been found or secured, and it had become substantially certain that, if a sale were to be effected, special agents must be selected who, by reason of concentration of effort as well as skill and ability and induced by the offer of liberal compensation, would undertake the task of procuring a purchaser financially able and willing to buy.

The defendant asked the trial judge to rule that the evidence did not warrant a finding that the agreement of January 23, 1900, was made in good faith and with such regard for the interests of the corporation by its directors and officers as to constitute a binding contract. While Watson was president and a director and Adams was clerk and treasurer of the corporation, each owning a large number of shares, Watson refrained from voting when the proposed contract was mooted, and the vote authorizing it was passed unanimously by the other members who constituted a majority of the board. And on May 7, 1900, the stockholders at a meeting duly called unanimously voted, "that all the acts and doings of the Company's directors and officers in the conduct of the general business of the Company be and are hereby ratified and confirmed."

The record leaves no doubt, nor do the parties contend, that any private purchaser could be or ever was obtained. But after the enactment of St. 1897, c. 486, approved June 10, 1897, to take effect upon its passage, entitled "An Act to secure public ownership and control of certain portions of the foreshore of Boston Harbor," the board of harbor and land commissioners acting under § 1 of the statute, and in conformity therewith, took on October 28, 1898, in fee certain portions of the flats as described in the taking, which was duly recorded as required by law. The company and the board having failed to agree upon damages, counsel were employed to protect the rights of the defendant. While it is contended that the taking was invalid, the subsequent transactions between the company and the Commonwealth show that the directors of the port of Boston acting under the subsequent St. of 1911, c. 748, § 4, an act relative to the port of Boston, made on November 20, 1913, a taking in fee of the defendant's flats in the rear of the flats comprised in the alleged first taking. By the agreement of July 26, 1916, and without the assent of the plain-

tiffs, a round sum of more than half a million dollars was paid to the company for the flats or lands covered by each taking. It is plain that the last extension of time by the company for performance having terminated January 1, 1911, the plaintiffs if they can recover are entitled to a commission only on the amount received for the first taking.

The defendant petitioned for damages under the statute and, after the passage of St. 1913, c. 624, permitting the Commonwealth to be impleaded in writs of entry, brought an action to try title and to recover possession, claiming that the statute was unconstitutional because no provision was made for adequate compensation. It appears that, an adjustment of all matters in dispute having been effected, the defendant remised, released and forever quitclaimed to the Commonwealth a parcel of land and flats specifically described, "meaning and intending hereby to convey all the right, title and interest of the said East Boston Company in and to all its lands and flats included within the lines of the description set forth in the taking made by the board of harbor and land commissioners acting in behalf of said Commonwealth of Massachusetts on the twenty-eighth day of October 1896. . . ." And thereupon the petition to recover damages was disposed of by the entry of "judgment for the petitioner for one dollar without costs and judgment satisfied in full," and, in the writ of entry "judgment for the tenant without costs."

But even if it be assumed that the defendant is bound by the contract and that the jury under appropriate instructions would have been warranted in finding that the alleged unconstitutionality of the statute had been waived, and that the amount received for the first taking could have been substantially ascertained and the commission computed, the defendant also contends, and asked the judge to rule that the contract of May 21, 1897, was invalid because it was contrary to public policy, and that on all the evidence the plaintiffs could not recover.

Where the facts are not in dispute, the question, whether a contract is against public policy, is a question of law under all the circumstances of the particular case. *Weber* v. *Shay & Cogan,* 56 Ohio St. 116. *Egerton* v. *Brownlow,* 4 H. L. Cas. 1.

When the contract was executed, the Legislature was in session before which the measure was pending, upon the report of the

commissioners, which in twenty days thereafter became St. 1897, c. 486. It was thoroughly understood by the parties that, unless the statute was enacted, the defendant could not reasonably expect to dispose of its property and the plaintiffs would not be entitled to any commission. The ownership must be acquired by the Commonwealth, or the whole project after a long period of exploitation and of strenuous effort would fail. If not expressly conceded, the uncontradicted evidence introduced by the plaintiffs is conclusive, that they had been conducting a systematic campaign before the session began to reach members elect of the House of Representatives not only to support the proposed bill, but to vote for a candidate for speaker whom they suggested or represented as being favorable to it, and who also would have the power to appoint a committee on the part of the House whose members would be inclined to consider favorably the question of public ownership of the flats.

The contract on its face however shows no tendency to injure the public. Payment of the commission is conditioned upon the success of the plaintiffs if achieved by legitimate means. *Kerr* v. *American Pneumatic Service Co.* 188 Mass. 27. And a demurrer to the declaration could not have been sustained. *Barry* v. *Capen,* 151 Mass. 99, 100.

The plaintiffs, as well as the defendant by its officers, had the undoubted right to urge before legislative committees either in person or by counsel, or by those interested in their behalf, the passage of the proposed act. But if the real purpose of the company was to obtain, and of the plaintiffs to render, services which in any manner depended on their success in the use directly or indirectly of improper influence or practices upon members of the Legislature to whom the proposed statute must be presented, or had been presented, the contract comes within the principles so elaborately pointed out in *Fuller* v. *Dame,* 18 Pick. 472, and is unenforceable. *Beers* v. *Wardwell,* 198 Mass. 236. *Baltimore & Ohio Southwestern Railway* v. *Voigt,* 176 U. S. 498, 505. It is of no consequence that eventually there does not appear to have been any actual harm to the public. The test is, whether the underlying tendency of the contract under the conditions described was manifestly injurious to the public interest and welfare. *Meguire* v. *Corwine,* 101 U. S. 108. It is not necessary that the parties should

stipulate for corrupt action to be procured or induced by bribery, or the promise of future monetary gain, or the emolument of office. It is sufficient if the contract, when applied to the facts, inevitably tends to results which impair not merely the character of the Legislature, but the public confidence in its integrity. The question, whether the flats should be acquired for the public benefit, rested solely in the determination of the Legislature whose members were bound to exercise their judgment uninfluenced by extraneous considerations, whether arising from motives of friendship, or the desire to benefit or subserve directly or indirectly private interests under whatever guise they might assume. And the distinction as we have said is obvious between solicitation or influence exerted to secure legislation, and legitimate services to enable legislators to understand the merits of measures upon which they are called to pass. *Davis* v. *Commonwealth*, 164 Mass. 241. *Trist* v. *Child*, 21 Wall. 441.

The consideration which the plaintiffs were to receive not only is single, but depended upon, and was measured by, what they had unlawfully done and, if necessary, were to continue to do as an indivisible transaction until success ultimately should crown their efforts. *Kennedy* v. *Welch*, 196 Mass. 592. *Hazelton* v. *Sheckells*, 202 U. S. 71.

We are therefore of opinion that the rulings should have been given. *Frost* v. *Belmont*, 6 Allen, 152, 159. *Pratt* v. *Foot*, 6 Conn. 332. *Buck* v. *First National Bank of Paw Paw*, 27 Mich. 293. *Houlton* v. *Dunn*, 60 Minn. 26. *Mills* v. *Mills*, 40 N. Y. 543. *Spalding* v. *Ewing*, 149 Penn. St. 375. *Marshall* v. *Baltimore & Ohio Railroad*, 16 How. 314. *Tool Co.* v. *Norris*, 2 Wall. 45. *Trist* v. *Child*, 21 Wall. 441. 6 R. C. L. Contracts, § 138, and cases cited in note 15. St. 1890, c. 456, § 3, as amended by St. 1891, c. 223, now R. L. c. 3, §§ 23–32. The exceptions must be sustained, and judgment in each case entered for the defendant. St. 1909, c. 236, § 1.

*So ordered.*