WILLIAM M. NOBLE *vs.* MEAD-MORRISON MANUFACTURING COMPANY.

Middlesex.    October 18, 19, 1920. — January 5, 1921.

Present: RUGG, C. J., DE COURCY, CROSBY, CARROLL, & JENNEY, JJ.

*Contract,* What constitutes, Performance and breach, Validity.    *Practice, Civil,* Motion for continuance, Question for jury, Exceptions, Judge's charge.    *Evidence,* Presumptions and burden of proof, Relevancy and materiality.

An exception to a refusal to grant a motion, supported by affidavits, for the postponement of a trial on the ground of the absence from the country of material witnesses presents to this court no question of law.

At the trial of an action by an attorney at law against a corporation upon an oral agreement alleged to have been made on July 30, 1915, for "services rendered in obtaining an order from the British government for the manufacture of one hundred thousand six-inch shells at $18 per shell," there was evidence that, previous to July 30, there had been conversations between the plaintiff and the defendant's authorized general manager, in which the general manager had said that the defendant was looking for business and was ready to make munitions, but that he "did not care to enter into any arrangement about it; if anybody brought in any business he would pay for it;" that on July 30, in the presence of one B and following a discussion as to war contracts and a proposed meeting the following day between the plaintiff and a member of an advisory commission of the British government, there was a conversation in which the plaintiff said to the general manager, "I have told B that I will not present

the name of any concern" to the member of the British advisory commission "unless I have a definite agreement as to my compensation, because I want no dispute about it afterwards;" that the general manager replied, "B says you have got to have five per cent;" that the plaintiff answered, "Yes, that is so;" that the general manager then said, "Well, that will be satisfactory provided we get an order and don't have to pay anybody else;" that the plaintiff then agreed that he would settle with others associated with him and would protect the defendant from their claims, and the general manager further stated, "I don't want you to talk the business end of it at all; I will talk prices myself . . . what I want is to get in touch with some man who can talk for the government and I will do the talking." There was evidence controverting that of the plaintiff. *Held*, that

(1) A finding was warranted that a contract was made substantially as testified by the plaintiff;

(2) The contract which the jury from the plaintiff's testimony might find to have been made was sufficiently certain in its terms, and was not vague, uncertain and meaningless;

(3) A finding was warranted that the amount agreed to be paid to the plaintiff was five per cent of the gross price of the order, contract and business which the defendant procured;

(4) Upon the conflicting evidence, the contract being oral, the ascertainment of what contract was made, if any, was for the jury.

Instructions included in the charge to the jury, at the trial of the action above described, upon the question, whether the minds of the parties came into accord upon the subject matter of the contract and whether their understanding of its essential terms was mutual, were *held* to have been adequate.

At the trial of the action above described, there was further evidence tending to show that previous to July 30, 1915, the defendant's general manager had tried to secure a contract for shells and had failed and had said that he would not pay his fare to New York for that purpose again; that the plaintiff then visited a general of the British army, who was a member of an advisory commission of the British government without authority to make contracts, presented to him a drawing of a shell which the defendant preferred to make and described the defendant's facilities for making them; that as a result of that interview another member of the commission immediately visited the defendant's factory in Boston for an inspection, bearing a letter to the general manager and the defendant signed by the British general and containing a reference to the conference with the plaintiff and to representations made by one of the plaintiff's associates to another member of the commission as a reason for the inspection; that the report of the inspector was favorable; that thereafter the defendant's general manager interviewed the British general and was in frequent communication with him and bankers who were the authorized representatives of the British government until the contract was made. The foregoing evidence was controverted. *Held*, that a finding was warranted that the plaintiff and his associates were the efficient cause in the procuring by the defendant of the contract with the British government.

Instructions to the jury, at the trial above described, upon the question, whether the plaintiff and his associates were "the efficient cause in bringing about the contract, having it come to the defendant," were *held* to have been accurate and sufficient.

The mere fact, that a contract between a salesman and his principal provides that the compensation of the salesman as to a contract concerning goods to be furnished to the government shall be to some degree contingent upon his success in procuring the contract for his principal, does not render the contract illegal.

While a contract respecting public service and public welfare is illegal if by its express terms, by its inherent tendency or by the means necessarily or by fair implication intended to be employed in its execution it requires the performance of acts corrupt in themselves or inclining toward the pollution of public or private honesty and integrity of purpose, the question, whether such a contract is valid, must be determined in each case by weighing all of the elements involved therein; and, if upon the evidence there is a fair doubt whether those elements are present which would make the contract illegal, the question, what was the purpose of the contract, must be left to the jury.

At the trial of the action above described, it appeared that payment of any compensation to the plaintiff was contingent upon his success in procuring the making of a contract with the British government, and that the amount of his compensation was to be five per cent of the gross amount of a contract procured. The agreement between the plaintiff and the defendant on its face did not import the use of illegal means nor require the inference that the plaintiff held himself out as possessing political or other influence, or that the defendant thought that it was purchasing such influence. Conduct and correspondence of the parties did not as a matter of law indicate the use of personal or political influence as the means by which the ends sought were to be accomplished. The relations of the parties were open and understood by all concerned. *Held,* that a finding was warranted that the import of the plaintiff's agreement was to act as attorney or agent in bringing the defendant to the notice of responsible representatives of the British government and in initiating negotiations in behalf of the defendant looking toward the consummation of a contract; and that the contract was not illegal as a matter of law.

At the trial of the action above described, evidence of work done by the plaintiff and his associates in the way of correspondence and negotiations looking to a performance of the contract was admissible although it was not shown to have been done with the knowledge of the defendant.

The plaintiff's claim, in the action above described, being upon an express contract and for an amount specified in the contract and depending upon the size of the contract procured between the defendant and the British government, evidence was not admissible as to the value of the services rendered by the plaintiff and his associates, or as to the amount done by the defendant in performance of its contract with the British government.

In the circumstances, it was *held* that it was not essential, as a prerequisite to the admission, at the trial of the action described above, of evidence of correspondence and conferences with members of the British commission, to show their exact authority to act for their government.

CONTRACT for $90,000 for "services rendered in obtaining an order from the British government for the manufacture of one hundred thousand six-inch shells at $18 per shell," the plaintiff's claim being based upon an oral agreement, described in the opin-

ion, alleged to have been made by the parties on July 30, 1915. Writ dated September 1, 1916.

The answer, besides a general denial, included an allegation that the contract relied on by the plaintiff was unlawful and unenforceable.

The action was tried in the Superior Court before *Hitchcock,* J. Material evidence is described in the opinion. At the close of the evidence, the defendant moved that a verdict be ordered in its favor. The motion was denied. The defendant then asked for the following rulings of law:

"1. An agreement for compensation contingent upon the success of the beneficiary in obtaining contracts from an organized government or its representatives is illegal and cannot be made the basis of a cause of action.

"2. Any agreement for pecuniary considerations to control the business operations of a government is void as against public policy without reference to the question as to whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements and closes the door to temptation by refusing them recognition in the courts.

"3. If the jury find that the plaintiff had agreed to obtain for the defendant a contract and it was agreed that the services of the plaintiff were dependent upon the contingency of obtaining such a contract, then the verdict must be for the defendant.

"4. If the jury find that the plaintiff contemplated procuring a contract for the defendant by exercising influence through Mr. Elliott upon a member of the British Parliament, any agreement to pay compensation for such services would be illegal and void and the verdict must be for the defendant.

"5. If the jury find that the plaintiff did exercise any influence through Mr. Elliott or otherwise upon a member of the British Parliament or any official of the British government, then such methods are illegal and no compensation can be collected therefor and the verdict must be for the defendant.

"6. If the jury find that the plaintiff personally or by Mr. Elliott exerted influence upon either D. A. Thomas or General Pease to induce them to enter into a contract on behalf of their government with the defendant for the manufacture of shells and that the plaintiff should receive therefor a compensation from

the defendant, the amount of which was dependent upon the success of his influence, then the plaintiff cannot recover.

"7. There is no evidence upon which the jury may find a contract between the defendant and the plaintiff of sufficient certainty to admit of its being enforced in a court of law.

"8. There is no evidence that would warrant the jury in finding that the efforts of the plaintiff constituted an efficient and predominating cause for obtaining for the defendant any munition contract.

"9. There is no evidence in the case that either General Pease or D. A. Thomas were authorized by the British government to place any contract.

"10. There is no evidence that would warrant the jury in finding that either General Pease or D. A. Thomas ever recommended that any contract be awarded this defendant.

"11. There is no evidence upon which the jury may find that the work testified to by the plaintiff was the effective cause of any munitions contract being awarded to the defendant.

"12. There is no evidence upon which the jury might find that there was ever any meeting of the minds between Martin and Mr. Noble in regard to a commission of five per cent.

"13. If the jury find that the conversation in regard to compensation between Mr. Noble and Martin was substantially as follows: — Martin: 'Mr. Boutwell tells me that you must have five per cent.' — Mr. Noble: 'That is right.' — Martin: 'That will be satisfactory provided I don't have to pay anybody else.' — such conversation is not sufficient as a matter of law to create a contract for the payment to the plaintiff by the defendant of a commission of five per cent of the gross amount of the contract of September 20th and the verdict must be for the defendant."

The rulings were refused, except as they were given in the charge.

Material portions of the charge to the jury were as follows:

"This is an action of contract in which the plaintiff claims that he was in fact employed by the defendant corporation to render certain services for the benefit of the defendant, and that those services were rendered and the defendant received the benefit of them, and that this employment was for a definite compensation,

and that he has performed his services and the defendant has failed to pay.

"Now, the fundamental idea in an action of contract is that the two parties to the case shall get together. By that I mean that there must be some agreement between the parties. If a person does work for another he is entitled to his pay, provided that work was done under an agreement for pay, or under such circumstances that in the ordinary experience of business life such services are usually paid for.

"A contract or an agreement between two parties must be in either one of two ways at least. One is by an express agreement. That is two persons may come together and one may say to the other, 'If you will do certain things I will pay you a certain amount of money,' and the other man says 'All right, I will do them,' and he goes ahead and does them, then he comes around and says to the first man 'Pay me.' Now, that we would call an express contract. That is a simple contract, it has in it all the elements of a contract, and the person for whom the services were rendered under such circumstances would be held in point of law as obliged to pay for the services that were rendered. . . .

"So that the first thing that the plaintiff has to establish in an action of contract as a matter of law is to satisfy the jury by a fair preponderance of the evidence in the case that there was some agreement between himself and the defendant. That is the first step, and unless the plaintiff can prove there was some agreement either express or implied, on the part of the defendant to pay him, why the plaintiff would not be entitled to recover anything. We call that the burden of proof, and we say that the burden of proof is upon the plaintiff in an action of contract to satisfy you that there was a contract, that there was an agreement between himself and the defendant that he should perform certain services. It is not material perhaps that those services should all be performed subsequent to the time when the agreement was made. If the work that he is to do is the result of work which he had done in the past, the benefit of which he is bringing to the defendant by virtue of the agreement with the defendant, why, the plaintiff would be entitled to maintain his claim against the defendant. That is, on this first principle I am speaking of, he would be entitled to say that there was an agreement with the

defendant by which he was to perform services which might include the services previously rendered. . . .

"In the second place the plaintiff in an action of contract must satisfy you that he has performed his part of the agreement, that he has done what he agreed to do and what he undertook to do or what he was hired to do by the defendant; and then, when he satisfies you of that, why, the next step, of course, is to show that the defendant has not performed his part of the agreement.

"Now, in this action the claim of the plaintiff as set forth in his declaration is that he was in fact employed by this defendant company to obtain for the company some contracts and that it was done, the agreement was made; that the agreement on the part of the defendant was that if he obtained contracts for them the defendant would pay him five per cent of the gross amount of any such contracts that might be received by the defendant in consequence of the efforts put forth by the plaintiff, and upon that question there is a divergence of testimony. It is a controverted question. The defendant says through its general manager, — who for the purposes of this case may be assumed to be and may be referred to perhaps as the defendant, — the defendant says that they never made any such agreement with the plaintiff, never agreed to pay him five per cent and never made any agreement of that kind. That is a controverted question of fact, and that is a question of fact for the jury to determine, and upon that, as I have stated, the burden of proof rests upon the plaintiff.

"Then the next question is as to what the plaintiff did in furtherance of that contract. There is a controversy there. The plaintiff says that through his efforts and the efforts of those associated with him a certain contract did come to the defendant, and the plaintiff says he was, he and his associates were the efficient cause in bringing about the contract, having it come to the defendant. And the defendant says 'No.' The defendant says 'We got the particular contract that is referred to, but we didn't get it through any efforts of the plaintiff or his associates. We got the contract independently, from an entirely independent source,' and denies that the plaintiff had anything to do with it, was not the cause in bringing about the awarding of the contract to the defendant company. That being a controverted question

of fact, that is a question for the jury to determine, and upon that, as I have stated, the burden of proof rests upon the plaintiff.

"Now, as this case has been tried and as it appears from the pleadings upon the two phases of the case that we have referred to, the only question arises as to whether there was an agreement between the parties and whether the agreement was to pay five per cent and whether the agreement has been complied with as far as the plaintiff is concerned; and the plaintiff rests on no other claim than the whole claim, and that is the issue here, it is not an issue as to what the plaintiff should have as a reward for what services he did. That is not here. That is not in issue, and we are not in any way to consider the question of the value of the services that were rendered. . . .

"Now, it is necessary in every contract before a contract can prevail in court, that it should appear that that contract was a valid contract, that it was not illegal, and there a question is raised in this case. . . .

"The courts will not sustain a contract which is illegal or a contract or an agreement to do an unlawful thing, and if the performance of the contract involves either altogether or in part the doing of an illegal act, that, of course, ends the contract as far as the court is concerned. The courts will not give any help to any such contract, and the defendant says here that if this contract was made it was a contract to do an illegal act, an unlawful act, and the illegality that is complained of by the defendant is that it was a contract on the part of the plaintiff that he himself or those associated with him in connection with this matter were to exert personal influence, bring personal influence to bear upon some officials or agents of the British government to induce them to award a contract which they had the authority to award to the defendant.

"Now, it is a well settled principle of law I think that if a man agrees that he will exert personal influence, use his personal influence with a public official who has to do with the awarding of contracts for the United States, or for a city or public authority, that he will endeavor to bring about the awarding of a contract by means of his personal influence, that is against public policy and would be illegal.

"Now, a distinction is recognized and well recognized upon this

point, and that is this, a distinction between an agreement to bring about things by personal influence, to induce a public official to make a contract simply through personal relations with a party, and the use of what we term legitimate proceedings by the party as an attorney or an agent to obtain a contract.

"Now, it is perfectly proper in cases where contracts are to be awarded by public officials, where public action is to be taken by officials, where public action is to be taken by officials or agents of a government, for parties who are interested to have their matters presented to such officials by attorneys and by agents, and if the attorneys or the agents simply present to the officials who are to award the contract information and arguments to induce them to make investigations, all with the purpose of enabling the official to act for the best interests of his country, his government, if that is all he does, such action is perfectly legal and the person rendering such action may receive pay therefor, and such pay might well be contracted for and the amount thereof might be determined and such things would be perfectly lawful, provided there is no element of the personal relations and personal solicitation and friendship between the parties enters into it. If it does, if a man undertakes by his personal solicitation and personal friendship with a public official to get that official to act in his official capacity, why then he is trying to induce the man to act not for the good of the country or the government for which he acts but to induce him to act from personal motives between themselves which may be of one kind or may be another. . . .

"Now, the plaintiff says that in this case . . . he did act as an attorney, and that all that he did, — he and his associates did — were not of a personal nature, but [that] they were open, straightforward act[s] for the purpose of putting the representatives of the British government, agents of the British government in possession of facts and of presenting to them arguments from which the personal element was excluded to induce them to examine into the matter and to award the contracts as they should deem best for the best interests of their government.

"That is the plaintiff's claim, and the defendant denies that. Consequently there is a question of fact in there with the burden of proof resting upon the plaintiff to satisfy you that if he made a contract with the defendant he made a legal contract, a contract

that it was perfectly lawful for him to make, and that what he did under that contract were things which he had a perfect right to do, and that his action was lawful."

The judge then presented to the jury special questions, with comments as follows:

"First: Was the contract between the British government and the defendant obtained as the result of services which were rendered by the plaintiff or those associated with him." As to this question, the judge stated: "Of course, if they were not, if this contract was not obtained as a result of services rendered by the plaintiff, why, of course, the plaintiff is not entitled to any compensation."

"Second: Were services rendered by the plaintiff or those associated with him which were effective in enabling the defendant to obtain a contract with the British government." Upon this question, the judge commented: "We sometimes put it this way in regard to a broker's commission. We say that a broker in order to obtain a commission must show that he was the efficient cause of bringing about the sale, no matter whether he actually completes it or not, so that the same principle would come in here and is involved in the second question."

"Third: If services were rendered by the plaintiff or those associated with him which were effective in enabling the defendant to obtain a contract with the British government, were such services rendered at the request of or with the knowledge and consent of the defendant for the benefit of the defendant." The judge, upon this question, said: "That, of course, refers to the first proposition which I have stated to you as the first proposition in an action of contract. Were the services rendered at the request of the defendant or with the knowledge and consent of the defendant for the benefit of the defendant?"

"Fourth: Did the defendant agree with the plaintiff that if as a result of the plaintiff's efforts an order for the manufacture of munitions should be obtained by the defendant then the defendant would pay the plaintiff for his services a sum equal to five per cent upon the gross amount of any contract for munitions which might be so acquired."

As to the foregoing four questions, the judge charged the jury: "In order for the plaintiff to prevail in this action it would be

necessary that those four questions should be answered in the affirmative. If any of them are answered in the negative, the plaintiff cannot prevail."

"Fifth: If there was an agreement between the defendant and the plaintiff, as stated in question four, were the services to be rendered thereunder by the plaintiff to consist in whole or in part of the exercise of personal influence on the part of the plaintiff or those associated with him upon officers or agents of the British government who might have authority to award contracts for the purpose of procuring such contracts." The judge further stated to the jury upon this subject, "If the personal element did enter in as contemplated in that question, why then the plaintiff could not prevail. So that for the plaintiff to prevail in this action it would be necessary to answer that question in the negative."

"Sixth: If there was an agreement between the defendant and the plaintiff as stated in question four, were the services to be rendered thereunder by the plaintiff to consist of negotiations as attorney or agent with such officials for the purpose of furnishing information and proper arguments to induce and enable said officials or agents to act for the best interests of the government represented by them." As to the fifth and sixth questions, the judge further stated: "Of course, those last two questions offer the issue as to whether this agreement, if there was such an agreement, included in part or in whole the exercise of personal influence or did it consist simply of the legitimate negotiations to which I have referred."

The jury answered the fifth question in the negative and the others in the affirmative, and found for the plaintiff in the sum of $104,260.80. The defendant alleged exceptions.

*J. L. Hall & S. C. Rand,* (*A. MacLeish* with them,) for the defendant.

*H. D. McLellan,* (*C. F. Lovejoy* with him,) for the plaintiff.

RUGG, C. J. This is an action to recover a commission, which the plaintiff alleges to be due under an express oral contract with the defendant to pay him five per cent for his services in connection with its obtaining from the British government a contract to make one hundred thousand six-inch shells at $18 each. Confessedly the defendant under date of September 20, 1915, made

such a contract with the British government. The defendant pleaded a general denial and illegality of the contract. It filed specifications of illegality to the effect that the contract contemplated that the plaintiff would exercise "improper influences" — "his supposed personal influence" — upon the agents of foreign governments to induce them to give to the defendant a contract or contracts, and that the natural tendency of the contract was to induce the plaintiff to use improper and personal influences upon agents of foreign governments.

There is no specification of illegality on the ground of maintenance or champerty. See *Blaisdell* v. *Ahern*, 144 Mass. 393; *Hadlock* v. *Brooks*, 178 Mass. 425.

When the case was reached for trial the defendant filed a motion, supported by affidavits, for postponement on the ground of absence from the country of material witnesses. The plaintiff refused to admit that the witnesses would testify as stated in the affidavits. Rule 25 of the Superior Court (1915). The refusal to grant a postponement presents no question of law. It was for the court to determine whether there had been due diligence in trying to secure the attendance of the witnesses or to procure their depositions or whether for any reason justice required a postponement. To this end the rule of court permits the introduction of evidence. No evidence aside from the affidavits appears in the record, although it is recited that there was a hearing. Ordinarily the granting of a continuance is for the presiding judge alone. *Pickering* v. *Reynolds*, 111 Mass. 83. *Kittredge* v. *Russell*, 114 Mass. 67. *Sullings* v. *Ginn*, 131 Mass. 479. *Soper* v. *Manning*, 158 Mass. 381. There is nothing in the case at bar to indicate abuse of discretion or arbitrariness in requiring the trial to go on.

The defendant's motion for a directed verdict, filed at the close of the evidence, was denied. In answer to six questions the jury found in substance (1) that the contract between the defendant and the British government was obtained as a result of the services rendered by the plaintiff and those associated with him, (2) that such services were effective in enabling the defendant to obtain that contract, (3) that such services were rendered at the request of or with the knowledge and consent of the defendant, (4) that the defendant agreed with the plaintiff to pay a sum

equal to five per cent upon the gross amount of the contract to the plaintiff for his services, provided they resulted in its obtaining a munitions contract, (5) that the agreement between the plaintiff and the defendant was not in whole or in part for the exercise of personal influence by the plaintiff upon the agents of the British government authorized to award contracts, (6) that the agreement between the plaintiff and the defendant was for making negotiations as attorney or agent for furnishing information and proper arguments to enable and induce officials of the British government to act for its best interests.

There was evidence tending to show that as early as May, 1915, the plaintiff had a talk with one Martin, the vice-president and general manager of the defendant (whose authority in the premises is not questioned and on the evidence could not well be assailed), concerning the manufacture of munitions by it, during which he said in substance that the defendant was looking for business and ready to make munitions, but he "did not care to enter into any arrangement about it; if anybody brought in any business he would pay for it." There were subsequent communications between the parties, and on July 30 Martin and one Boutwell met the plaintiff at his office, where after some discussion as to war contracts and a proposed meeting the next day in New York between the plaintiff and a General Pease of the British government, this conversation occurred (according to the testimony of the plaintiff): "I said, 'I have told Mr. Boutwell that I will not present the name of any concern to General Pease unless I have a definite agreement as to my compensation, because I want no dispute about it afterwards.' And Martin said, 'Boutwell says you have got to have five per cent,' and I said, 'Yes, that is so.' He said, 'Well, that will be satisfactory provided we get an order and don't have to pay anybody else.'" And the plaintiff then agreed that he would settle with others associated with him and would protect the defendant from their claims. Further conversation at the same interview related in part to the price at which the defendant would manufacture shells, wherein Martin said, "I don't want you to talk the business end of it at all; I will talk prices myself . . . what I want is to get in touch with some man who can talk for the government and I will do the talking." Boutwell testified that he told Martin, before

going to the plaintiff's office, that he thought the plaintiff could get some contracts "with a commission of five per cent that Mr. Noble wanted," and that when the three were together in the plaintiff's office "this matter of five per cent was brought up, and if I recollect correctly, it was agreed to. . . . Mr. Martin said that I had mentioned that he wanted five per cent to get the business. . . . Well, he [Mr. Noble] said so." Martin in his testimony denied that such conversation took place, but said that the plaintiff was to represent the defendant as attorney.

There was evidence sufficiently explicit to support a finding that a contract actually was made in substance as testified by the plaintiff. The subsequent conduct and correspondence between the parties, and assertions in letters from Martin to the plaintiff (as to the force of which see *Huntress* v. *Hanley,* 195 Mass. 236, *Callahan* v. *Goldman,* 216 Mass. 234, *Sargent* v. *Lord,* 232 Mass. 585), all were for the consideration of the jury. It cannot be said that as matter of law they overcame the direct and positive testimony of the plaintiff.

The testimony offered in behalf of the plaintiff was sufficiently certain in its terms to constitute a contract. So far as not precisely expressed in words, it fairly implied that the plaintiff should use rational efforts to the end that the defendant might procure a contract for the manufacture of munitions and that the defendant should pay him, within a reasonable time thereafter, the stated commission. The words used do not specify the sum on which the percentage is to be computed. The several words descriptive of the thing to which the percentage referred were "order," "contract," "business." It fairly is inferable from the context in which these words were used that a commission to be paid by a percentage on "an order" for the manufacture of shells is to be reckoned on the gross price of the order, contract or business. If it had been intended to narrow the subject of percentage to the profit arising from the contract, to the cost of the goods, to the gross price of goods actually manufactured and delivered, or to any other more restricted basis, that thought naturally would have been expressed in apt language. The contract was not vague, uncertain or meaningless. The case at bar is distinguishable from decisions like *Cheney Bigelow Wire Works* v. *Sorrell,* 142 Mass. 442, and *Marble* v. *Standard Oil Co.* 169 Mass. 553.

It was sufficiently definite to warrant recovery. The defendant's requests for rulings, numbered 7 to 13, were denied rightly. *Noble v. Joseph Burnett Co.* 208 Mass. 75.

The contract was oral and there was sharply conflicting testimony as to its terms. The ascertainment of the contract as actually made must be left to the jury. *Gassett* v. *Glazier*, 165 Mass. 473, 480. *Phenix Nerve Beverage Co.* v. *Dennis & Lovejoy Wharf & Warehouse Co.* 189 Mass. 82.

The instructions of the trial judge were adequate touching the point that, in order that a contract could be found to have been made, the minds of the parties must have come into accord about the subject, and their understanding of its essential terms must have been mutual. The principle is plain. *Dzuris* v. *Pierce*, 216 Mass. 132. To say that, in order that there might be a contract, the parties must "get together" and that there must be "some agreement between the parties," and that the plaintiff must prove "some agreement . . . on the part of the defendant to pay him," cannot, under all the circumstances and in the light of the rest of the charge, have left the jury in any rational doubt as to the exact point in issue and the burden of proof resting on the plaintiff. The defendant's twelfth request for ruling was covered adequately by the charge.

The jury were justified in finding on all the evidence that the plaintiff and his associates were the efficient cause in the procurement by the defendant of its contract with the British government. Summarily stated, there was testimony to the effect that Martin had tried and failed to secure a contract for shells; that he had said he would not pay his fare to New York for that purpose again; that the plaintiff then visited General Pease of the British Army in New York, who was member of an advisory commission and a representative of the British government but without authority to execute contracts; that at this interview the plaintiff presented to General Pease a drawing of the shell which the defendant preferred to make and described the defendant's facilities for making them; that as a result of that conference another member of that commission immediately visited the defendant's works in Boston, bearing a letter to Martin and the defendant signed by General Pease, in which he referred to the conference with Mr. Noble and to representations made by one

of the plaintiff's associates to one Thomas, another British representative, as the reason for the inspection; that the report of the examination of the defendant's plant was favorable. The inspector, called as a witness by the defendant, testified that he made this inspection as a result of Mr. Noble's conference with General Pease. Immediately after the inspection Martin saw General Pease and was in frequent communication with him and with representatives of J. P. Morgan and Company, the authorized agents of the British government, until September 20, 1915, when the contract for one hundred thousand shells at $18 each was signed. There were other inducing and subsidiary circumstances which if the main facts were found to be as narrated might be regarded as supporting the contention that the real cause of the award of the contract to the defendant was the effort of the plaintiff. Whether the chain of causation leading to that result was the work of the plaintiff both before and after the interview of July 30 when the contract was made according to the plaintiff, or whether that chain did not exist at all or was broken before the result was reached, were questions of fact concerning which the jury reasonably might have taken the view favorable to the plaintiff if they gave credence to his testimony and drew the inferences from other testimony confirmatory of his contentions.

The instructions upon this branch of the case were accurate and sufficient. The jury were told that the plaintiff must prove that he and his associates were "the efficient cause in bringing about the contract, having it come to the defendant." While this might have been amplified, it was correct in law and cannot be said to be inadequate. The controversy between the parties in this particular was whether the defendant secured the contract through the exertion of Martin or through the efforts of the plaintiff. The words of the charge are plain, easily understood and in common use. It is hardly likely that the jury could have misunderstood the respective rights of the parties and what they must find in order to reach a conclusion in favor of the plaintiff. The words "efficient cause" often are used in judicial decisions to express the obligation of proof of one who seeks to recover a commission on a sale of property. *Woods* v. *Lowe,* 207 Mass. 1. *Cohen* v. *Ames,* 205 Mass. 186. The defendant's requests 8, 9,

10 and 11 rightly were refused either as unsound or not pertinent to the issues.

The most troublesome aspect of the case is whether the contract was illegal as against public policy, in that its necessary tendency was adverse to public welfare and inconsistent with good morals. It is a principle of the common law, indubitable in its soundness and inflexible in its application, that contracts will not be enforced directly or indirectly, but will be stricken down as void, which tend injuriously to affect the public welfare, or which promote the use of personal influence or extraneous pressure upon the conduct of public officials. Activities, not openly and straightforwardly presented as agent or attorney but disguised as disinterested or as founded upon zeal for the public good, cannot be the foundation for a successful action at law although resting upon an express promise of financial reward. A contract respecting public service and public welfare is illegal, which by its express terms, by its inherent tendency, or by the means necessarily or by fair implication to be employed in its execution, requires the performance of acts corrupt in themselves or inclining toward the pollution of public or private honesty and integrity of purpose. Representatives of our own or of friendly nations in the making of contracts in behalf of their sovereign principals should be actuated solely by the best interests of their government and not be subjected either openly or furtively to influences springing from personal selfishness, pressure of friends or of powerful officials, considerations of political or business expediency, social or religious motives, or any other inducements which tend to warp their judgment or divert their conduct from the singleness of patriotic sincerity by which alone at all times they ought to be completely dominated. These principles were early declared and have been continuously and unswervingly adhered to by this court. *Fuller* v. *Dame,* 18 Pick. 472. *Adams* v. *East Boston Co.* 236 Mass. 121. The principle is recognized generally. *McMullen* v. *Hoffman,* 174 U. S. 639, 648. *Meguire* v. *Corwine,* 101 U. S. 108. *Crocker* v. *United States,* 240 U. S. 74. *Sage* v. *Hampe,* 235 U. S. 99. *Hayward* v. *Nordberg Manuf. Co.* 29 C. C. A. 438, 445, 446; 85 Fed. Rep. 4, 11. *Veazey* v. *Allen,* 173 N. Y. 359. In the application of these principles in other jurisdictions there have been statements of the law directed to

particular facts then before the court, and conclusions reached, which perhaps may be hard to reconcile. The soundness of the principles is nowhere questioned.

The mere making of a contract concerning goods to be furnished to the government, where the compensation of the salesman is to some extent contingent upon his success, is not invalid. So far as concerns authority, that point is settled in principle in this Commonwealth by *Kerr* v. *American Pneumatic Service Co.* 188 Mass. 27. The plaintiff in that case was employed by the defendant to make for it mail contracts with the government on a stipulated salary, to be increased with increase of sales. It was said, page 29, that it could not "be ruled as matter of law that the contract calls for other than legitimate work on the part of the plaintiff. . . . If such work only is contemplated, the provision for an increase of salary when the government mail contracts reach a certain amount cannot be said to be one which has a tendency to induce the use of corrupt or improper acts on the part of the agent." The circumstance that in that case the entire time of the agent was devoted to the business of his principal cannot be regarded as a determining factor. In *Brown* v. *Winnisimmet Co.* 11 Allen, 326, a contract for the chartering of a boat of the defendant at a stipulated price, the plaintiff to recharter at highest obtainable rate and divide the profit with the defendant, although made with the understanding that she was to be rechartered to the United States for war service, was held not to be illegal but valid and enforceable. Although the illegality of the contract was not pleaded in that case, nevertheless the court took notice of alleged illegality of that nature as it was bound to do. *Claflin* v. *United States Credit System Co.* 165 Mass. 501, 503. *O'Brien* v. *Shea*, 208 Mass. 528.

In principle the decision in *Valdes* v. *Larrinaga*, 233 U. S. 705, is to the same effect. In that case Larrinaga, who had been assistant secretary of a governmental department but had retired from office, agreed to help Valdes to procure a water franchise from the government of Porto Rico, the assistance to be rendered "in the steps to be gone through and in everything in connection with said concession, such as plans, projects, and all what concerns to the technical part," including "personal or professional services" and to receive as compensation ten per cent of the con-

cession.  It was held that the things done pursuant to the contract, such as joining in an application to the Military Governor for a franchise, helping to present it to the Secretary of War and preparing plans and specifications for presentation to the Executive Council of Porto Rico, had "no sinister smack" and that there was nothing to control the decision of the district judge that the contract was not against the policy of the law.  We are unable to perceive how a principle can apply to contracts for selling goods to a government different in its essence or in its general statement from that applicable to securing concessions from government.  If a percentage contingent on success is valid in the one kind of case it would seem to be equally so in the other.  In *Oscanyan* v. *Arms Co.* 103 U. S. 261, at pages 275, 276, it was said with reference to furnishing the government with supplies of any kind: "It is legitimate to lay before the officers authorized to contract, all such information as may apprise them of the character and value of the articles offered, and enable them to act for the best interests of the country.  And for such services compensation may be had as for similar services with private parties, either upon a *quantum meruit*, or, where a sale is effected, by the ordinary brokerage commission."  There are expressions in *Tool Co.* v. *Norris*, 2 Wall. 45, repeated in some subsequent decisions, which taken by themselves alone and applied as abstract tests might prevent the plaintiff's recovery.  It is plain from the facts disclosed in *Tool Co.* v. *Norris*, 2 Wall. 45, that Norris contracted solely for "concentrating influence at the War Department," through senators and other persons supposed to possess it, for the purpose of procuring a contract for supplying firearms to the government, and that that was the single object of his exertions.  Manifestly that contract was flagitiously illegal, both on its face and in the means naturally, and in truth intended, to be used in its performance.  It is not necessary to discuss the question whether some of the sweeping expressions as to agreements for compensation to procure legislation concerning well established claims held against the government, or contracts from the government to furnish its supplies, found in *Tool Co.* v. *Norris*, are narrowed by or are inconsistent with later and more guardedly phrased judgments.  See *Nutt* v. *Knut*, 200 U. S. 12, 21, 22, affirming *Knut* v. *Nutt*, 83 Miss. 365; *Parish* v. *MacVeagh*, 214 U. S.

124, 132, 137; *McGowan* v. *Parish,* 237 U. S. 285; *Capital Trust Co.* v. *Calhoun,* 250 U. S. 208, 217; *Oscanyan* v. *Arms Co.* 103 U. S. 261, 275, 276.

It generally has been held that agreements for fees for procuring legislation upon a matter of public or private interest, in respect of which the party has not a well established claim against the government, contingent upon success of the project, have an inevitable tendency to poison the purity of legislation and are invalid. Contracts for lobbying or having a manifest tendency to that end, are universally condemned. *Marshall* v. *Baltimore & Ohio Railroad,* 16 How. 314, 334–336. *Trist* v. *Child,* 21 Wall. 441. *Hazelton* v. *Sheckells,* 202 U. S. 71. It was an agreement of that character which was held invalid in *Adams* v. *East Boston Co.* 236 Mass. 121.

The general principle fairly deducible from the decisions is that ordinarily no one factor is decisive in determining whether the contract concerning furnishing supplies to the government is void as contrary to public policy. Contingency of compensation upon success, percentage upon the amount involved in sales directly to the government, and the size of the fee, all are elements entitled to consideration. The words "contingent compensation" in connection with a contract may be used either in an obnoxious or in a harmless sense. The tenor of the contract may be such in connection with its setting as to stamp it with invalidity. If it bears any badge of fraud, either covertly or openly, it must be stricken down. The question of the legality of the contract in each case is to be determined by weighing all the elements involved and then deciding whether its inherent tendency is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government. If such is its tendency, it must be pronounced illegal. If that point is open to fair doubt upon all the evidence, its purpose must be left to the jury under appropriate instructions. This seems to us to be the effect of the federal cases to which reference has been made. It is supported by numerous other adjudications. *Lyon* v. *Mitchell,* 36 N. Y. 235. *Dunham* v. *Hastings Pavement Co.* 118 App. Div. (N. Y.) 127, affirmed in 189 N. Y. 500. *Bush* v. *Russell,* 180 Ala. 590. *Kansas City Paper House* v.

*Foley Railway Printing Co.* 85 Kans. 678.  *Winpenny* v. *French,* 18 Ohio St. 469.  *Bergen* v. *Frisbie,* 125 Cal. 168.  *Opinion of the Justices,* 72 N. H. 601.  *Saville Brothers Ltd.* v. *Langman,* 79 L. T. Rep. (N. S.) 44.  *Stanton* v. *Embrey,* 93 U. S. 548.  *Houlton* v. *Nichol,* 93 Wis. 393.  *Denison* v. *Crawford County,* 48 Iowa, 211.  *Workman* v. *Campbell,* 46 Mo. 305.  *Stroemer* v. *Van Orsdel,* 74 Neb. 132.  *Beal* v. *Polhemus,* 67 Mich. 130.  See *Davis* v. *Commonwealth,* 164 Mass. 241.

While the case is close upon this point, it cannot quite be said as matter of law that the plaintiff was not entitled to go to the jury or that the express finding of the jury, to the effect that the services to be rendered by the plaintiff were not to consist in whole or in part of personal influence upon agents of the British government, must be set aside as wholly unsupported by evidence.

The contract here in question plainly made the compensation of the plaintiff contingent upon his success in procuring for the defendant a contract from the British government for the manufacture of shells, and the amount of his compensation was dependent upon the size of the contract. Such a contract between individuals touching a matter, dissociated from government, is not illegal. *Stanton* v. *Embrey,* 93 U. S. 548, 556.  *Ball* v. *Halsell,* 161 U. S. 72, 80. Such contracts are common in ordinary business. The commission to real estate brokers on the sale of land is a familiar illustration. The numerous varieties of brokerage commissions are agreements of this nature, where both the compensation and the amount of it are contingent upon the success of the transaction.

On its face the contract upon which this action is founded did not import the use of illegal means. Its terms are innocent of any taint. The inference is not required that the plaintiff held himself out as possessing or that the defendant thought it was purchasing political or other influence. The conduct of the parties did not necessarily indicate the use of personal or political influence as the means by which the end aimed at by the contract was to be accomplished. While there was some correspondence with a member of the British Parliament, chiefly if not wholly before the contract here in suit was made, that was directed to the methods employed by the British government of doing business in this country, sought a change in those methods, and was

expressly on its face for the benefit of that government. It was all open. The representative capacity of the plaintiff and his associates as acting in behalf of competent manufactures was kept manifest throughout. The general tone of the communications does not convey the intimation of sinister influences. The amount claimed by the plaintiff, while large, is not itself illegal. The percentage was the same as that upheld in *Valdes* v. *Larrinaga,* 233 U. S. 705. The record taken as a whole shows that the question whether personal influence and official pressure were a part of the contract could not have been ruled as matter of law. The case upon this point is fully covered by *Barry* v. *Capen,* 151 Mass. 99. The jury might properly have found, as they did, that the import of the plaintiff's agreement was to act as attorney or agent in bringing the defendant to the notice of responsible representatives of the British government and in initiating negotiations in behalf of the defendant looking toward the consummation of a contract. The whole matter rightly was left to the jury under instructions which, while they well might have been more full, cannot be pronounced in view of the facts to have been inappropriate or inadequate. The several requests of the defendant for instructions upon this branch of the case either were fairly covered in the charge or denied rightly.

Numerous exceptions were taken to the admission and exclusion of evidence. Much of that admitted related to work done by the plaintiff and his associates in way of correspondence and negotiations, of which the defendant would not have knowledge but which was competent as bearing upon the work done. The order of its introduction was within the discretion of the trial judge. Evidence as to the value of the services of the plaintiff and his associates rightly was excluded, since the trial of the case was confined by pleadings to the express contract for a specified commission. For the same reason the number of shells actually made by the defendant under the contract was of no consequence. It was not essential as a prerequisite to the admission of evidence of correspondence and conferences with General Pease and Thomas to show their exact authority as representatives of Great Britain. It all constituted a part of the situation of which the defendant was kept advised at his request and desired to take advantage. Without their precise powers being shown, the con-

tract of the defendant with the British government may have been found to have been dependent upon them. Without reviewing these exceptions further in detail, it is enough to say that in them we discover no reversible error.

*Exceptions overruled.*