Essex County Circuit Court.

MURRAY B. STONE, ALEXANDER H. STONE, E. DAVID STONE, SARAH STONE AND ANNA L. STONE, CO-PART-NERS DOING BUSINESS AS STONE & STONE CO., PLAINTIFFS, v. WILLIAM STEINEN MANUFACTURING CO., A CORPORATION, DEFENDANT.

Decided June 19, 1944.

For the plaintiffs, *Milton M. Unger.*

For the defendant, *Pitney, Hardin & Ward* (*Charles R. Hardin*).

WILLIAM A. SMITH, C. C. J. This action by consent was tried before the court without a jury on May 8th, 1944, and the decision thereon was taken under advisement, and since that time counsel have submitted their briefs.

The suit is brought to recover two weeks' salary at $400 a week based upon a written agreement of employment entered into on December 31st, 1942, but it was provided therein that it should be operative and effective as of July 1st, 1941, the period of employment to run for three years from July 1st, 1941, until June 30th, 1944, the salary payable each week commencing the 1st day of July, 1941.

The agreement provided that the plaintiff partnership would by means of the personal service of one or more of them assist the defendant in its dealings with such departments, agencies, and officers of the United States Navy relating to contracts sought or obtained by the defendant from the United States Navy and the departments and agencies thereof. The employment was not to be an exclusive one, the plaintiffs retaining the right to engage in other pursuits and represent and serve other employers and concerns for whom they might secure or endeavor to secure contracts with the United States Navy or any departments thereof, even though such employers might be competitors of the defendant.

The complaint alleges that the agreement was supplemented by another agreement made December 31st, 1942, effective July 1st, 1941, but no recovery is sought upon this supplemental agreement. Copies of the agreement and of the supplemental agreement are made part of the complaint. Plaintiffs allege performance of the contract on their part and a failure on the defendant's part to pay the installments of salary due September 11th and September 18th, 1943, of $400 each, amounting to $800.

The defense set up is that the agreement is illegal because it is against public policy, or to state it more properly, that the consideration for the agreement in question is in part illegal as against public policy.

It will be noted that the agreement in suit was not entered into until December 31st, 1942, and was to be effective as of July 1st, 1941. At the trial evidence as to the previous relationship between the parties and their previous arrangement or contract governing the compensation for their services from July 1st, 1941, was admitted in evidence, and the abrogation of the agreement which governed the relationship of the parties from July 1st, 1941, to the date of the agreement sued on became part of the consideration for the agreement sued on. The payment of the stipulated salary from July 1st, 1941, to December 31st, 1941, was provided for in the contract sued on by the defendant paying to the plaintiff the sum of $27,000 together with the allowance of $4,200 theretofore paid by the defendant to the plaintiff, it being provided that the total of the two, amounting to $31,200, should constitute payment in full for the stipulated salary from July 1st, 1941, to December 31st, 1942.

This contract of employment also provided as follows:

"It is also understood and agreed that the death, withdrawal or disability (for any cause whatever), of one or more members of said co-partnership shall not terminate this contract or operate to lessen, restrict, qualify, impair or in any way affect the 'employer's' liability to pay the weekly salary hereinabove stipulated to the end of the three-year term of employment herein created (and any extension thereof as hereinbelow provided), which liability to pay said weekly salary to said co-partnership for the surviving members thereof shall continue, persist and endure to the end of the three-year term of employment so long as there remains or remain alive one or more of said co-partners ready and willing to perform the duties by this agreement assumed by the 'employee' herein."

While the suit is brought by the partnership, which consists of three brothers and the wives of two of them, the original transaction with the defendant was entered into by Alexander H. Stone, and he acted in the matter throughout the entire relationship with the defendant except in minor instances when he was not available. The women members of the co-partnership took no active part.

The facts leading up to the execution of this agreement and the institution of the suit are found to be that the defendant had a plant considered adaptable for doing manufacturing work for the United States Navy. The defendant had tried but had been unable to obtain any direct prime contracts from the Navy. A short time previous to July 1st, 1941, the defendant was referred to Alexander Stone by a Mr. Aronson, for whom Stone had obtained contracts from the Navy; it also appeared that there were three other firms for which the Stones had done similar service. It was represented to the defendant that the services of Alexander Stone might be obtained upon the same terms as those upon which he represented these other firms.

It appears in so far as Alexander Stone is concerned that he had given up a business as a mortgage loan broker which he conducted in Newark, New Jersey, and went to Washington, where he was employed by the Federal Housing Authority for a period of years, and that in 1940 Mr. Stone began dealing with the Navy in procuring contracts for parties he represented, holding himself out to be a manufacturers' representative. It does not appear that Mr. Stone had any technical background in reference to obtaining contracts or that he was employed, in reference to the work with the Navy, in any technical capacity.

The defendant decided to employ Stone: An arrangement was entered into the terms of which are embodied in an undated letter which was written on or about July 1st, 1941, by the defendant to Alexander Stone. A copy of this contract is attached to the defendant's answer and is referred to as *Exhibit A* and it was put in evidence by the plaintiff as *Exhibit P-2*. This letter of employment states that the defendant is desirous of having a duly accredited representative to assist it in the handling of the necessary details in bidding and negotiation for government contracts with the Navy Department for materials and supplies and in closing and performing such contracts. The period of employment was referred to as commencing July 1st, 1941, and ending June 30th, 1944. It contemplated Mr. Stone's advising and consulting with the officers and employees of the company with

respect to government contracts for materials and supplies for the Navy Department to be manufactured by the defendant with respect to performing such contracts; that Mr. Stone should consult with the duly authorized Navy Department procurement officers and technicians in connection with bids and negotiations looking toward such government contracts for the Navy Department as well as the performance by the company of the terms thereof, and that Mr. Stone's time need not be devoted exclusively to the business of the company. The compensation was provided as follows:

"(a) At the time of the acceptance of the materials and supplies by the Government for the Navy Department with a sum equal to two and one-half per cent. (2½%) of the amount contracted to be paid to the company by the Government therefor;

"(b) At the time of the receipt by the company of payment in full for such materials and supplies with a sum equal to two and one-half per cent. (2½%) of the gross amount so received.

"Such credits shall be adjusted periodically by payment to you less in each instance the amounts advanced in accordance with the provisions of item 4."

Item 4 provided for a drawing account of $150 a week so long as the sums paid were less than five per cent. of the total amount being paid on the contract.

The fifth clause of the contract had a provision about its termination due to death or the option of the company, but such termination was precluded in so far as compensation was payable under contracts executed and delivered prior to its termination.

The seventh provision of the contract is as follows:

"In the event that the company is not permitted to deduct from its gross income for the purpose of determining its net taxable income (United States or any political subdivision thereof) the amount payable to you under Item 3 or Item 6, such amount payable to you under either of said items shall be reduced by an amount equal to the additional normal income taxes payable by the company by reason of the disallowance of such deduction."

The employment also provided that Mr. Stone was to pay his own traveling and other expenses.

The plaintiff Alexander Stone was not employed in any technical capacity, but his work in the first instance was to obtain the inclusion of the name of the defendant on an approved list of bidders, namely, to obtain for the defendant from the Navy Department an invitation to bid. This he did. It appears by the evidence in the case he also attended to the preparation and submission of bids, and after the award of the contracts his duties were principally, if not solely, to attend to the contracts between the defendant and the Navy Department and its representatives. The important part of this work included the obtaining of additional machinery from the government so as to extend the defendant's plant in order to perform the work under the contracts, the expediting of the payments due under the contract, and I gather from the evidence that what the plaintiff Alexander Stone did in this case was about the same work that he did for the other concerns which employed him where he obtained the contracts from the Navy Department. I am satisfied that most of this work entailed contact with representatives of the Navy Department.

In this case two contracts were obtained, one dated August 9th, 1941, and the other September 18th, 1941, which provided for payments aggregating approximately $1,700,000. The contracts with the government contained the following provision:

"Article 11. *Covenant against contingencies.* The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingency. Breach of this warranty shall give the Government the right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingencies. This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through *bona fide* established commercial or selling agencies maintained by the contractor for the purpose of securing business."

The first payments, five in number, I believe, ran up to June 10th, 1942. Thereafter deductions were made by the Navy Department from these payments up to August 7th, 1942, to cover five per cent. of the amount of those payments and the previous payments from which deductions had not been made, and from August 7th, 1942, to March 3d, 1942, deductions of five per cent. were made from each payment. The total billing by the defendant to the United States Navy up to March 3d, 1943, was $853,460; the net payments were $810,102.10. This difference between the amount billed and the amount paid is accounted for by deductions for cash payments and a deduction of five per cent. on the amount of the payments.

These five per cent. deductions were made by the Navy Department because under the terms of its contract the defendant was required to submit its figures with reference to the costs and profits, and in the statement submitted it appeared that the plaintiff Alexander Stone was being paid five per cent. on the contract, stated as selling expense, the government taking the position that article 11 prohibited such fees, and deducting them from the payments as excessive for the materials delivered.

Mr. Stone's claim as to the reason for the change in the contract is that they were considering changing from a commission basis to a salary basis because the money involved was so great on a commission basis, namely, that they had not anticipated it would amount to so much money and that they did not want to build up a ninety per cent. cash fund to pay taxes but preferred to have the compensation paid by way of salaries for approximately the amount which they would receive on a commission basis. It appears, however, from Mr. Steinen's testimony that Mr. Stone was investigated by the Vinson Congressional Committee and that Mr. Stone advised the defendant that if the compensation was reduced and put in the form of a salary that it might be passed by the government, and I am satisfied that it was the government's claim, through the attorney for the committee, or from the Navy Department itself, that prompted Mr. Stone to advocate the change. The government evidently did not

consider Mr. Stone an accredited representative as contemplated by the exception in article 11 of the contract, the exception of that provision being that it should not apply to commissions on contracts or sales "made through *bona fide* established commercial or selling agencies maintained by the contractor for the purpose of securing business."

· I am satisfied that the evidence in this case discloses that Mr. Stone did not come within the ground of this exception. The deduction of the five per cent. which the Navy Department had made from the payments to the defendant was a serious matter to the defendant because this five per cent. which was disallowed would come out of the profits that the defendant made on the contract, and not be an expense in its performance, and therefore could not be considered as an expense in the performance of the contract in the computation of the defendant's income tax. Mr. Stone claimed that this deduction would not have been made if the allowance had been properly reflected in the setting up of the costs under the contract, saying that it should have been put in as an administrative expense and not as a selling expense, and if it had been put in as an administration expense it would not have been disallowed.

· For the reasons I have stated they entered into the agreement sued on and the supplement which was to take the place of the original agreement of employment entered into about July 1st, 1941. It is perfectly evident that the purpose of the agreement sued on was to endeavor to overcome the objection to the payment of the five per cent., by changing the payments from a contingent commission of a percentage of the amount of the contracts to a salary basis, and for a reduction of the amount of commission from five to four per cent. to meet the claim of excessive payment. The amount of the salary fixed in the new agreement I believe works out to a payment of four per cent. on the amount of the contract spread over the period as salary.

We therefore have as a result of these changes a reduction of the rate of commission from five per cent. to four per cent., and a change of the payments from contingent commission to salary; the new arrangement for payments was for the

carrying out of the original arrangement of contingent commission but reduced from five to four per cent.

It is important to note that the supplemental agreement entered into simultaneously with the execution of the agreement sued on for all practical purposes is in effect a provision to pay a contingent commission on new contracts or renewals or extensions of existing contracts, the contingent commission being paid in the form of salary for an extended period.

My conclusion from the three agreements and the other evidence submitted is that the prime purpose of employing Stone was to secure favorable action from the representatives of the United States Navy in obtaining the right to bid, the award of contracts, and if successful in the award of the contracts, action on Mr. Stone's part on behalf of the defendant in obtaining action from the representatives of the Navy favorable to the defendant in the matter of carrying out the contracts secured from the Navy Department.

The defendant claims that the service Mr. Stone contracted to perform cannot be legally contracted for on the basis of payment to be made contingently on a commission basis on the ground that such agreement is against public policy. As has been stated, the defense is that the contract sued on is the substitution of an agreement which is void as against public policy, and the consideration in part for the agreement sued on is the completing of the payments under the contingent contract.

The general principle involved is that contracts which tend to injure the public service of the government are against public policy and void, particularly where they influence executive or administrative action, and especially contracts, which provide for a contingent compensation.

It is not necessary for me to review cases upon these principles; the principles and their application, together with the cases, are reviewed in 17 *Corp. Jur. Secundum, Contracts,* *p.* 573, § 212; *p.* 577, § 214; 12 *Amer. Jur. p.* 703, § 202; *p.* 707, § 205; *p.* 709, § 206; *p.* 711, § 207; *Old Dominion Transp. Co.* v. *Hamilton,* 146 *Va.* 594; 131 *S. E. Rep.* 850; 46 *A. L. R.* 196; *Hall* v. *Anderson,* 18 *Wash.* (*2d*) 625;

140 *Pac. Rep.* (*2d*) 266; 148 *A. L. R.* 768; 6 *R. C. L.* 707, 741.

Counsel for both the plaintiff and the defendant in the argument before the court referred to the principle set forth in the *Restatement of the Law of Contracts* of the American Law Institute under sections 562 and 563, which are as follows:

"Section 562: A bargain to endeavor to secure a public contract by presenting to the official having power to make the contract inducements except such as relate to the desirability on public grounds of entering into the contract, is illegal; but if no influences other than these are bargained for, or contemplated, the bargain is not illegal.

"Section 563: The fact that compensation fixed in a bargain for efforts to secure legislation or official action is contingent on success, is not conclusive evidence that improper means are contemplated in securing the desired result."

It is urged by the defendant that the New Jersey rule is stricter than the principle in the *Restatement,* and the case of *Weehawken* v. *Hass,* 13 *N. J. Mis. R.* 231; 177 *Atl. Rep.* 434, is cited. In that case suit was brought upon a contingent contract made with the plaintiff for services to be rendered in obtaining a reduction of a tax assessment, and our Supreme Court held that such a contract was void as against public policy, inferentially holding that it was not necessary to prove that there was any sinister motive. The New Jersey annotations under section 563 of the *Restatement of the Law of Contracts* indicate the New Jersey variance in this case from the rule in the *Restatement.*

It is not necessary to determine whether or not the case of *Weehawken* v. *Hass, supra,* applies so as to hold that the mere fact that the employment was a contingent one on a percentage basis renders the contract in suit and the one which forms the consideration for it, void as against public policy. I can see that we may have contingent percentage contracts employing individuals to represent principals in preparing bids and obtaining contracts from public agencies without their being void as against public policy.

It seems to me that the rule which I should follow in this case in order to determine whether this contract is void as against public policy and cannot be enforced is: Does the arrangement between the plaintiffs and the defendant involve or promote sinister or corrupt means to accomplish its end and tend to bring influence on the representatives of the Navy Department to act other than to the sole advantage of that department and the government which it represents?

My guide in determining the question presented is clearly set forth in the opinion of Chief Justice Rugg in the case of *Noble* v. *Mead-Morrison Manufacturing Co.*, 237 *Mass.* 5; 129 *N. E. Rep.* 669 (at *p.* 674), where he says:

"The general principle fairly deducible from the decisions is that ordinarily no one factor is decisive in determining whether the contract concerning furnishing supplies to the government is void as contrary to public policy. Contingency of compensation upon success, percentage upon the amount involved in sales directly to the government, and the size of the fee, all are elements entitled to consideration. The words 'contingent compensation' in connection with a contract may be used either in an obnoxious or a harmless sense. The tenor of the contract may be such in connection with its setting as to stamp it with invalidity. If it bears any badge of fraud, either covertly or openly, it must be stricken down. The question of the legality of the contract in each case is to be determined by weighing all the elements involved and then deciding whether its inherent tendency is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government. If such is its tendency, it must be pronounced illegal. If that point is open to fair doubt upon all the evidence, its purpose must be left to the jury under appropriate instructions."

Under the rule I am to follow I am convinced it is unnecessary to prove that the parties themselves contemplated sinister or corrupt means, or that the representatives of the government should act otherwise than for the advancement of the government.

This is so indicated by our Court of Errors and Appeals in *Brooks* v. *Cooper*, 50 *N. J. Eq.* 761 (at *p.* 773); 26 *Atl. Rep.* 978, 982, where the court says:

"All agreements, for financial consideration, to control or influence the business operations of the government, or the appointment of public officers, are void as against public policy, without reference to the question whether improper measures are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptations by refusing them recognition in the courts."

The court then cites *Providence Tool Co.* v. *Norris,* 2 *Wall.* 45; 17 *L. Ed.* 868, and other cases, and says:

"And so considerations of the same kind, of inferior moment, apply, whenever the necessity or even probable effect of the contract will be to divert any public servant from the path of duty, or cause favoritism or interest to prevail in the determination of questions which should be examined with a view to the general good and the just claims of the parties in interest."

The test is: *Has a contract such as the one we are considering such a tendency?* The question is one of fact for the court sitting without a jury.

That the parties actually intended that sinister or corrupt means were to be used, or that the representatives of the government should act otherwise than in its interest, was not proved in this case. So in order to pass on the question of whether the consideration of this contract is illegal it is necessary for me to examine the facts in this particular case in order to determine if it is a contract of such a character as tends to the use of sinister or corrupt means, or to influence the representatives of the government in acting otherwise than in the advancement of the best interests of the government.

The facts appear to be that Mr. Stone was a man who was not trained technically in the matters involved in the performance of the contracts. The services which he had been rendering were largely, if not wholly, with reference to procuring for his clients contracts with the Navy Department

of the United States, and helping his client with that department carrying out the contracts.

I do not mean to imply that the plaintiff Alexander Stone did not do valuable work; he did, but it was work that could be done by an experienced sales representative who was familiar with the details of negotiating with the government departments. Mr. Stone himself says in his testimony that there was nothing mysterious about his work, that "when you have the ability you can get this business without knowing anybody." But he said you had to know your way around and therefore could save a good deal of time.

As to Mr. Stone's work Mr. Steinen tells us in criticising the statement as to the amount of work that Mr. Stone says he did, that his statement was grossly exaggerated, and I believe him when he so states. Mr. Steinen said he had no technical work to do; that that was secret.

The quantum of services which he rendered or which it was contemplated that he render under the contracts in question, was entirely out of proportion to the amount of compensation involved; on contracts involving over $1,700,000 he stood to make under the original arrangement within a period of about three years around the sum of $85,000.

Mr. Stone and his brothers represented four other concerns in dealing with the Navy Department. It does not appear, so far as I can recall, that he had any other clients. These four other concerns were the A. C. Gilbert & Company, the Unique Art Manufacturing Company, the Lee Tire Company, and the Lionel Corporation. He testifies to the amount of money received from these companies after being put on a salary basis, which I understand was a change from a commission basis similar to what the arrangement was with the defendant. The salary with the Lionel Corporation was $500 a week running until 1947, with the Gilbert Company $400 a week plus one per cent. commission until 1947, with the Unique Art Manufacturing Company $200 a week and bonus which amounted last year, he said, to $400 a week, and from the Lee Tire Company he had received compensation but that had stopped owing to the fact that they had ceased doing the character of work that the plaintiff had negotiated for.

It thus appears that the plaintiffs were receiving nearly $100,000 a year in representing those five companies, and I cannot escape the conclusion that the services rendered the others could not have warranted the amount of compensation received.

As to his equipment for this service, the plaintiff did not maintain an office except at his home in Washington, and he employed no help except part-time employees. The arrangement, as has been stated, was originally made with Alexander· Stone, who testifies that his business was for the partnership; but the partners were relations, and the women who were in the partnership did practically nothing with reference to rendering service to him. In this particular case Alexander Stone was the only man that did anything with reference to the contract, except on a limited number of occasions when he was absent and his brother might have acted for him.

·We·must take into consideration the fact that this arrangement of having his office at his residence was not conducive to conducting the business along strict business lines; it opens the door to inducing the representatives of the government to conduct their business at the plaintiff's residence, and this is not always a wholesome atmosphere in which to confine transactions to strictly those executed on behalf of the best interests of the government through its representatives.

An examination of the terms of the original contract, the supplemental contract, and the one on which suit is brought, leads to the conclusion that it is one which is conducive to the use of sinister means. By the terms the representation was limited to dealings with the United States Navy and its departments as distinguished from other government departments. The inference is that Stone held himself out as being influential in his relations with representatives of the Navy Department. If this were not so why should he have limited his services to the United States Navy and its departments?

The provision which requires the contract to continue as long as there remains one member of the plaintiff firm, indicates that it is not so much the services that are to be rendered for which compensation is paid, but that the compensation is for the services that have been rendered in the obtain-

ing of the contract. Clearly there would be no object in continuing this contract for services if the two women or one of them were left as survivors of the firm.

I must therefore conclude that this provision with regard to employment as a representative on a salary is a mere blind for the purpose of covering up the fact that the compensation is for a percentage of the contract; otherwise why should the supplemental contract be made separate and without reference to it in the contract sued on?

I must therefore conclude from the facts as I have set them forth that the contract sued on and the consideration on which it is based is void as against public policy and judgment should be entered in favor of the defendant and against the plaintiffs.