This is an appeal from a judgment in favor of plaintiff in the sum of $9,512.98 entered in the Law Division, Superior Court.
The plaintiff Thomas McCabe is a salesman and the defendant Charles J. Kupper is a civil engineer specializing in sanitary sewerage engineering. The plaintiff testified that in May, 1937, the defendant discussed with him the selling possibilities in the sanitary engineering field, told him of the many municipalities throughout the country which were considering the construction of sewerage plants under stimulation of tendered grants and loans by the federal government, stated that he did not have the time to visit communities and confer with officials and did not "feel that he was a good enough salesman to really sell his own services," and offered to employ the plaintiff for that purpose. The plaintiff further testified that when he pointed out that he was a salesman but had no engineering experience, the defendant told him that he would teach him enough to take care of the selling end and that when technical information was required the defendant or one of his engineers would be available. The employment was agreed upon between the parties and in the defendant's language the plaintiff, "was to receive ten per cent. on any work that he obtained by himself." The defendant took the plaintiff through a sewerage treatment plant which he had constructed at Manville, New Jersey, and through other plants which were under construction and, in addition, furnished text books on the subject. As the plaintiff expressed it, "he taught me enough about it, that I could discuss the matter fairly well in talking to these people."
Thereafter, over a period of years the plaintiff visited numerous municipalities including many which had been ordered by state authorities to correct bad sewerage conditions. He estimated that he called on officials in approximately 200 communities for the purpose of explaining the need of sewerage improvement and the special capabilities of the defendant. In communities where he was acquainted with businessmen *Page 181 
through prior sales activities, he obtained introductions to local officials. In connection with the "Triboro job," which is referred to in the testimony and briefs, he first conferred with a personal friend who was special counsel for the Borough of Rutherford and who, in turn, discussed the defendant's qualifications with municipal officials. The record is not clear as to whether he made appearances at formal meetings of official governing bodies although at one point in his testimony he said, "All formal meetings, I would have Mr. Kupper with me, in case there were technical questions to be answered."
The complaint filed in the lower court alleged the employment agreement between the parties and sought recovery to the extent of ten per cent. of the defendant's engineering fees on work resulting from the plaintiff's efforts. The answer denied the agreement and set forth, as a separate defense, that the plaintiff's claim had been satisfied. At the trial the defendant moved for a directed verdict on the ground that the contract was illegal but his motion was denied. The trial court was then requested to charge the jury that if they found that the tendency of the agreement was to invite or promote the use of sinister or corrupt means then they should return a verdict of no cause of action. The request was denied and the court, without mention of the issue of illegality, submitted the case to the jury on the controverted factual issues as to what work the plaintiff had actually procured for the defendant and whether he had received full payment therefor. The jury returned a verdict for plaintiff and judgment was entered.
It is true that, generally, our law favors the enforcement of contracts voluntarily made between competent parties and strongly disfavors the disavowal of contractual agreements by persons who have received and retained the benefits thereunder. See Steelev. Drummond, 275 U.S. 199, 72 L.Ed. 238 (1927); Coyne v.Superior Incinerator Co. of Texas, 80 Fed.2d 844 (C.C.A.2d 1936). This, however, gives way to the policy, of great public concern, which condemns all agreements which inherently tend to corrupt public *Page 182 
officials or to swerve them from the conscientious and impartial discharge of their duties. See 6 Williston, Contracts (Rev.Ed. 1938), §§ 1726 et seq. In furtherance of this policy there have been judicial expressions indicating that every agreement for the payment of fees for services, which is dependent upon obtaining a municipal contract, is per se invalid on the theory that its contingent nature constitutes a temptation for the use of improper means. See Weehawken Realty Co. v. Hass,13 N.J. Misc. 231 (Sup. Ct. 1935). In the light of the free and increasing use of contingency arrangements in legitimate business circles, we question the justification for the assumption that every agreement for sales to public bodies contemplates or tends to the use of improper means simply because the salesman is being paid in whole or in part on a contingent basis. Professor Williston and the Restatement have rejected this assumption. SeeWilliston, supra, § 1729(a); Restatement of the Law,Contracts, § 563 (1932). Indeed, the opinion of the Court of Errors and Appeals in Stone v. William Steinen Mfg. Co.,133 N.J.L. 593, 595 (1946), does not accept the view that every such contingent agreement is illegal; on the contrary, the court there referred at length and with approval to the views expressed in Noble v. Mead-Morrison Mfg. Co., 237 Mass. 5,129 N.E. 669 (Sup. Jud. Ct. 1921), where Chief Justice Rugg pointed out that no single factor in the agreement was decisive in determining whether the contract was void as contrary to public policy; that contingency of compensation, percentage upon the amount involved and size of the fee, were all proper elements for consideration, and that:
"The question of the legality of the contract in each case is to be determined by weighing all the elements involved and then deciding whether its inherent tendency is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government. If such is its tendency, it must be pronounced illegal. If that point is open to fair doubt upon all the evidence, its purpose must be left to the jury under appropriate instructions." *Page 183 
See, also, Hildebrandt v. National Solvents Corp.,137 N.J.L. 193 (E. A. 1948). But Cf. Davidson v. ButtonCorporation of America, 137 N.J. Eq. 357 (Ch. 1945); affirmed, 138 N.J. Eq. 113 (E. A. 1946).
In denying the defendant's motion for directed verdict the lower court said, "I see nothing illegal about the arrangement at all." To the extent that this meant that there was no proof that the parties actually contemplated or engaged in anything corrupt or immoral, we are in accord. However, that was not the controlling issue since under the cited authorities plaintiff was not entitled to recovery if, without more, the arrangement had "an inherent tendency to invite or promote the use of sinister or corrupt means to accomplish the end sought." See Stone v.William Steinen Mfg. Co., supra; Hildebrandt v. National SolventsCorp., supra. If from all of the evidence there was fair doubt as to such tendency, then that question should have been left to the jury for determination. See Noble v. Mead-Morrison Mfg. Co.,supra.
We are satisfied that there was such fair doubt and that the lower court erred in refusing to submit the issue of illegality to the jury. Considering all of the factors in the case, the jury might have found that the arrangement was such, that it naturally tended to promote the use of sinister or corrupt ends or to influence public officials to act on the basis of favor or other improper considerations. In such event its verdict would have been for the defendant. On the other hand, the jury's finding might have been that the arrangement simply contemplated and tended to the production before appropriate public officials, in proper fashion, of meritorious arguments and supporting data calculated to advise them of the advantages of proper sewerage installations and the special capabilities of the defendant's civil engineering organization in that field. In such event its finding on the issue of illegality would have been against the defendant.
The plaintiff refers to the fact that the defendant's answer did not assert the affirmative defense of illegality. While better practice dictates that the plea of illegality be *Page 184 
affirmatively set forth in the answer (see Rule 3:8-3), inGionti v. Crown Motor Freight Co., 128 N.J.L. 407 (E. A.
1942), the Court of Errors and and Appeals held, despite the then applicable Supreme Court Rule 58, that where, as here, the defendant has denied the making of the contract, he may assert its illegality without any affirmative plea. We find nothing in the new rules which purports to alter this decision and deem it controlling. Indeed, there is much to be said for the view that notwithstanding any deficiency in the formal pleading, the particular issue of illegality presented was one which, as Mr. Justice Field said in Oscanyan v. Winchester Arms Co.,103 U.S. 261, 26 L.Ed. 539 (1881), "the court itself was bound to raise in the interest of the due administration of justice."
The judgment below is reversed and a new trial ordered.