138 N.J. Super. 551 (1976)
351 A.2d 771
STATE OF NEW JERSEY, BY GEORGE F. KUGLER, JR., ATTORNEY GENERAL OF NEW JERSEY, AND BY FRANK M. PAPALE, JR., DIRECTOR OF THE DIVISION OF PURCHASE AND PROPERTY OF THE DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY, AND BY WILLIAM E. MARFUGGI, TREASURER OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS,
v.
ARNOLD CONSTABLE CORPORATION, A CORPORATION OF THE STATE OF DELAWARE, PITMAN REALTY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, REALTY ASSOCIATES COMPANY, A PARTNERSHIP CONSISTING OF WILLIAM B. COLSEY, III, AND BRUCE A. MAHON, BRUCE A. MAHON, INDIVIDUALLY, AND AS A PARTNER OF REALTY ASSOCIATES COMPANY, WILLIAM B. COLSEY, III, INDIVIDUALLY, AND AS A PARTNER OF REALTY ASSOCIATES COMPANY, AND PRUDENTIAL INSURANCE COMPANY OF AMERICA, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 1975.
Decided January 13, 1976.
*553 Before Judges MATTHEWS, LORA and MORGAN.
Mr. Richard M. Conley, Deputy Attorney General, argued the cause for appellants (Mr. William F. Hyland, Attorney General, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. Stephen N. Dermer argued the cause for respondents Arnold Constable Corporation and Pitman Realty, Inc. (Messrs. Lowenstein, Sandler, Brochin, Kohl & Fisher, attorneys; Mr. Archibald S. Alexander, Jr., of counsel and on the brief).
Mr. Richard M. Goldman argued the cause for respondents Realty Associates Company, Bruce A Mahon and William B. Colsey, III (Messrs. Stein, Bliablias, Goldman & McGuire, attorneys).
There was no appearance on behalf of respondent Prudential Insurance Company of America.
PER CURIAM.
The State instituted this action against defendants, alleging that defendants Arnold Constable and Pitman Realty, lessors, had breached a warranty contained in paragraph 19 of their lease with the State for premises at 209-219 East State Street, Trenton. The State alleged that Arnold Constable and Pitman Realty entered into an agreement with defendants Mahon, Colsey and Realty Associates which was contingent on the latters' success in leasing the premises and which required Constable and Pitman to pay them 10% of the State's rental payments if a lease were executed. The State claimed that this agreement and the payments made pursuant to it breached the state lease because *554 Mahon, Colsey and Realty Associates Company were not paid for services as bona fide brokers on behalf of Arnold Constable and Pitman Realty to negotiate the state lease. The State seeks the return of all amounts paid by Arnold Constable and Pitman Realty to Mahon, Colsey and Realty Associates and reformation of the lease to reduce the State's rental obligation.
The facts which are largely based on depositions, affidavits and exhibits provided to the trial judge on the motion for summary judgment are as follows: Arnold Constable has a leasehold interest in real property located at and commonly known as 209-219 East State Street, Trenton. The property is improved with a commercial building. It had leased a portion of the building to the State for office facilities in 1958 and it continued to lease the same portion of the building to the State under a lease executed in 1967.
Subsequent to the execution of the 1967 lease Arnold Constable made a business decision to phase out its retail business in Trenton and to convert the East State Street building to a better economic use. To that end it engaged the services of Alfred Weissman of the firm of Weissman-Winoker Real Estate, Inc., 501 Fifth Avenue, New York City. Weissman was engaged primarily to lease the property but Arnold Constable would apparently have been willing to sell its leasehold interest if a buyer became available. Weissman had also been engaged to rent portions of Arnold Constable's Manhasset and Hempstead stores. It was agreed with Weissman that he would receive a commission of 6% of the rental income over the term of the lease if he were to rent the Trenton property, and if he had to engage another broker to consummate a deal to lease the property, Weissman would receive a half commission of 3% and the retained broker would be paid a full 6% commission.
Subsequent to the agreement between Weissman and Arnold Constable, Weissman made continuous efforts to lease the building. He circularized other brokers offering them the opportunity to rent and receive a commission and *555 he contacted what he thought would be potential tenants such as the State, the telephone company and computer schools, among other potential users.
Sometime during early 1969 Merwin Bayer, the president of Arnold Constable, went to Trenton with Weissman to meet with the Director of the Division of Purchase and Property, Sullivan, to discuss a proposed lease with the State. During the meeting which took place in the director's office in the State House, Sullivan expressed some interest and indicated that there was a need for space. He brought State Supervisor Schumacher into the meeting and introduced him to Bayer and Weissman.
After the initial meeting of Bayer, Sullivan and Weissman, Bayer did not attend subsequent meetings in Trenton to discuss the lease proposal since Arnold Constable was relying on Weissman for this purpose. Weissman proceeded to work directly with not only officials in the Treasury Department responsible for leasing, but also with officials of the Division of Motor Vehicles, the Department of Institutions and Agencies and the Department of Insurance, all of which were looking for additional or new office space.
During the time that Weissman was representing Arnold Constable in attempting to interest the State in leasing that premises, the State was seriously considering a lease of the Rider College building on State Street in Trenton for about $4.25 or $4.35 a square foot, for the Department of Insurance. That department was also one of the agencies which was being considered for a possible move into the Arnold Constable building by Director Myers (Sullivan's successor) if the State were to lease that building.
Defendants Mahon and Colsey were two of the four owners of the Rider College building. Mahon met with Director Myers, State Supervisor Schumacher and Budget Director Wechsler regarding his proposal to lease the Rider building to the State at a suggested price of approximately $4.50 a square foot. Negotiations which approached agreement were terminated, however, when a newspaper printed a story *556 that Treasurer McCrane knew Mahon who was involved in the Rider College transaction.
On March 19, 1970 Director Myers sent a memorandum to Treasurer McCrane regarding the Arnold Constable premises. Myers said, in part:
Recent Legislation has now left us with two separate Departments  the Department of Insurance and the Department of Banking. It has been decided to relocate the Department of Insurance to the Arnold Constable Building. We are considering relocating the Department of Banking to 36 West State Street.
The available space at Arnold Constable has been inspected by Commissioner Clifford, Deputy Commissioner Shumake, Assistant Commissioner Papps and myself, and it is found to be suitable for this operation. We are presently in the final stages of our lease negotiations.
While Weissman was still negotiating with Myers regarding the lease of the Arnold Constable building, Weissman went to the building with Myers and Morgan Shumake, Deputy Commissioner of the Department of Insurance, to go through the building and discuss its merits for the use of the Department of Insurance. Mahon, who was unknown to Weissman and Shumake, appeared at this meeting and Myers informed them that Treasurer McCrane wanted Mahon to be at the meeting at the Arnold Constable building because Mahon "knew a lot" about real estate.
According to Shumake, Mahon also had been in attendance for at least one session in the early months of 1970 when the Treasury officials responsible for leasing, including Treasurer McCrane, Budget Director Wechsler, Director Myers and Supervisor Schumacher, had discussed the need for moving various state departments to new office facilities.
On or about July 1, 1970 Weissman met with Treasurer McCrane at which meeting McCrane informed him that the price asked by Arnold Constable was too high and that if he could find space for about $4 a square foot he would pay that. However, McCrane is said to have told Weissman at the time, "Send me a letter with your proposal and let me have it." Weissman and Bayer subsequently prepared a *557 letter to McCrane dated July 6, 1970, setting forth four alternate proposals by Arnold Constable for leasing its property. Subsequent to that letter Weissman made numerous attempts to telephone McCrane to get a further response, but none of his telephone calls was returned. Despite Weissman's continuing efforts to elicit a response from the State, no one from the State showed any interest in attempting to negotiate a lower price for the premises.
At about this point Weissman went to Bayer and told him that he would need someone with influence in order to get through to the Treasurer so that negotiations could continue. Almost immediately thereafter Bayer was directed to Mahon and Paul Anapol, a Philadelphia lawyer and Camden County freeholder. Upon being contacted by Bayer, Anapol called Mahon and agreed with him to do any legal work and asked Mahon to do the necessary broker's work. Anapol's impression at the time was that Bayer had gone to him because he was a personal friend of Governor Cahill, Secretary of State Paul Sherwin and Treasurer McCrane. When Bayer went to see Anapol, Arnold Constable was attempting to lease its Trenton building exclusively to the State of New Jersey since Weissman had pursued and exhausted all other reasonable possibilities.
On September 9, 1970 Bayer, with the assistance of Mahon, wrote to McCrane, over Bayer's signature, setting forth a modified proposal for leasing the Arnold Constable property to the State. Unquestionably, McCrane then knew of Mahon's relationship with Bayer.
Sometime in late November or early December 1970 Arnold Constable and the State agreed to the terms of a lease. At about that time Mahon and Colsey entered into a partnership agreement dated December 1, 1970 under the name Realty Associates Company. On December 15, 1970 Realty Associates Company entered into a commission agreement with Arnold Constable Corporation and Pitman Realty, Inc. The agreement refers to Realty Associates Company as *558 "Agent" and makes no mention of Mahon or Colsey. That agreement provides in part that the agent shall
Lease and offer for lease * * * space of the Owner in the building or buildings located on Premises [209-211 East State Street, Trenton], and use its best efforts to obtain for Owner leases thereof, and to renew leases, on such terms and conditions as Owner shall approve.
The agreement further provides that Arnold Constable
shall pay the Agent as compensation for its services hereunder a sum, payable in monthly installments, equivalent to ten (10) per cent of the total amount of the rental collections from Premises, including collections, if any, made by Owner or by Counsel for Owner.
Bayer testified that Colsey and Mahon did nothing in connection with the operation of the building itself pursuant to the December 15 agreement and that the only services they had performed were getting him the lease and, in the case of Mahon, serving as an on-going consultant in a variety of matters. He stated that Mahon's direct involvement in negotiating the state lease was "highly limited and minimal" and that he knew of no activity on the part of Colsey in connection with its negotiation.
At some point in the fall of 1970 Mahon and Colsey contacted Anapol by telephone and told him that they had made a lease for part of the building and that there was going to be a modest fee of $45,000 payable by Arnold Constable as a result of the leasing transaction. It was suggested to Anapol that he accept a fee of $15,000 for one-third of the total $45,000 payment as a complete satisfaction of any obligation Arnold Constable might have had to him. Anapol subsequently received a check from Realty Associates Company in the amount of $15,000 for legal services rendered in connection with the Arnold Constable lease. He was not informed by Colsey and Mahon that Arnold Constable had leased its entire building to the State in December 1970 for *559 15 years for a yearly rental of approximately $1,000,000 and for which they would receive 10% or approximately $100,000 a year for the next 15 years.
Based on the facts which we have sketched out above, the State claims that there is sufficient to support a strong inference that when the Rider College lease fell through because of unfavorable publicity, and defendants Mahon and Colsey were thus unable to profit from that transaction, the Arnold Constable negotiations ground to a halt until Mahon and Colsey could become involved in them. The State also argues that since it was almost certain that the Arnold Constable building would be leased to the State anyway, given the State's need for space, the lack of alternative buildings, and Arnold Constable's pressing business reasons for seeking to lease the store, it would have been a simple matter for interested parties to see to it that Bayer wound up with the services of the real estate broker who was a social and political friend of Treasurer McCrane. Further, the fact that McCrane had given some kind of role with respect to state leases to Mahon suggests that Mahon himself had some inside knowledge of landlords who were looking to the State as a prospective tenant. On the basis of these strong and reasonable inferences, the State concludes that there is already an overwhelming case that Arnold Constable's payments to Mahon and Colsey were not for negotiating the state lease but for influence peddling, and therefore it was erroneous for the trial judge to grant summary judgment to defendants.
Paragraph 19 of the lease in question between the State and Arnold Constable provides:
Lessor hereby warrants that the provisions of Sections 52:34-15[*] and 52:34-19 of the Revised Statutes of New Jersey have been complied with in that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except bona fide brokers employed by Lessor for the purpose of negotiating this lease, and further, that no fee, commission, compensation of any kind or gratuity has been paid, either directly *560 or indirectly, to any person employed by the State. [Footnote and emphasis supplied]
This language is clear in its intent to prohibit persons contracting with the government from paying contingent fees to an agent to procure a state lease unless the agent actually negotiates the lease and earns his fee by performing the usual functions of a real estate broker in connection with that specific transaction. In short, it condemns use of influence peddling such as is proscribed by the statute.
Our cases involving contingent fees to procure public contracts have consistently found such arrangements contrary to public policy. For example, in Davidson v. Button Corp. of America, 137 N.J. Eq. 357 (Ch. 1945), aff'd o.b. 138 N.J. Eq. 113 (E. & A. 1946), an agreement between a company and a dealer in small wares who was to receive a commission of 12 1/2% on the net selling price of plastic insignia buttons sold through his efforts to the Federal Government was invalidated:
The facts in this case leave no doubt that Davidson was employed by the defendant because it was believed that he had certain contacts and hence the agreement to pay a commission, which to me seems out of all proportion to the service he was called upon to render. While there is no proof in this case of sinister or corrupt means employed in procuring the contracts made with the government, the agreement between the parties is one which has a tendency to the use of corrupt means. The decision of this matter therefore does not turn upon the question of whether improper influence *561 was used but rather upon the corrupting tendency of the agreement.
The agreement is void as against public policy. [137 N.J. Eq. at 361-362].
Again, in Stone v. Wm. Steinem Mfg. Co., 22 N.J. Misc. 353, 39 A. 241 (Cir. Ct. 1944), aff'd 133 N.J.L. 16 (Sup. Ct. 1945), aff'd 133 N.J.L. 593 (E. & A. 1946), the opinion of the trial judge clearly sets forth the legal standard to be applied:
"The question of the legality of the contract in each case is to be determined by weighing all the elements involved and then deciding whether its inherent tendency is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government. If such is its tendency, it must be pronounced illegal. If that point is open to fair doubt upon all the evidence, its purpose must be left to the jury under appropriate instructions."
Under the rule I am to follow I am convinced it is unnecessary to prove that the parties themselves contemplated sinister or corrupt means, or that the representatives of the government should act otherwise than for the advancement of the government. [22 N.J. Misc. at 363, 39 A. at 246].
The trial judge thereafter found that the contract had such a tendency and was void. In affirming, the former Court of Errors and Appeals concluded:
There is nothing in the case before us to indicate that there was any reason for the employment of the plaintiff firm other than the fact that they had been successful in procuring Navy contracts, whereas the defendant had failed so to do. The only reason for the employment was that the plaintiffs knew how to make contacts with the Navy Department, but this Mr. Stone stated required no special training. They were employed by several other concerns and the salaries were out of all proportion to any work done. The employment had an inherent tendency to promote a corrupt means to accomplish the end. The evidence abundantly supports the findings. [133 N.J.L. at 596-597]
The same general view with respect to contingency arrangements to procure public contracts may be found in other *562 jurisdictions. See, e.g., The Providence Tool Co. v. Norris, 69 U.S. 45 (2 Wall.) 17 L.Ed. 868 (1865); Reynolds v. Goodwin-Hill Corporation, 154 F.2d 553 (2 Cir.1946); Hall v. Anderson, 18 Wash.2d 625, 140 P.2d 266 (Sup. Ct. 1943); Buckley v. Coyne Electrical School, 343 Ill. App. 420, 99 N.E.2d 370 (App. Ct. 1951); Gendron v. Jacoby, 337 Mich. 150, 59 N.W.2d 128 (Sup. Ct. 1953).
The trial judge in the present case attempted to distinguish the cases just cited and relied upon by plaintiff. In his oral opinion granting summary judgment he stated:
Many cases have been cited by counsel wherein contracts have been declared void in the manner in which the State, as plaintiff, would have this contract declared void. But, a review of those contracts involve a party to a contingency agreement with nothing whatsoever to offer to justify the payment to that party of a contingent fee other than his personal knowledge or available influence of or with a public official who had the authority to enter into the transaction on the part of the government. The case here is obviously so different as to render those cases inapposite for both Colsey and Mahon are authorized to act as licensed real estate brokers. As such, they are authorized by law to charge a commission for their services.
Further, in response to the State's argument that defendants had the burden to justify their right to a commission, he concluded that:
* * * even if there is such a right in the State to establish its case by the mere presentation of a contingent fee agreement and resting, that the defendants would likewise establish their case by proof that they are as is stipulated in this case licensed real estate brokers or parties who do not have to comply with that requirement and that would shift the burden right back to the State of going forward with the evidence and of establishing that the brokerage relationship was not a bona fide relationship. That being so, I find no comfort to the plaintiff in the allegation that the burden of proof is other than I find it to be.
In reaching his decision the trial judge thus placed considerable emphasis on the fact that defendants Mahon and Colsey were both authorized to act as licensed real estate *563 brokers. However, this fact, which the State never challenged, is only one of the factors in the overall context of the contingent fee arrangement in the present case which should be considered. The fact that these defendants were licensed real estate brokers does not, as a matter of law, satisfy the provisions of paragraph 19 of the lease here involved, or the provisions of N.J.S.A. 52:34-15. The fact that a broker is licensed is some evidence that the broker is within the contemplation of the exception set forth in paragraph 19 and the statute. Whether the broker comes within the exception of paragraph 19 of the lease and the statute is a question of fact to be resolved by the trier of the fact within the framework of the law as set forth above. That question is to be resolved by weighing all of the elements involved and then deciding whether the inherent tendency of the agreement is to invite or promote the use of corrupt means to accomplish the end or to bring influences to bear upon public officials which are improper. Cf. McCabe v. Kupper, 4 N.J. Super. 178, 182-183 (App. Div. 1949).
Finally, we note that the trial judge placed considerable emphasis on the statement made by the State in its brief to the effect that it "alleged no wrongdoing * * * and needs to prove none." This confession by the State is of no significance to the outcome of the case  it merely is an expression of the law as it exists in this area. The payment of contingent fees in public contracts is not illegal per se. McCabe v. Kupper, above. Indeed, both paragraph 19 of the lease in question and the applicable statute recognize this fact. What is prohibited, and what should be determined after a full trial here, is whether defendants Mahon and Colsey (and their corporation) were employed to procure this lease because they had, or were thought to have, some special access to public officials in control of leasing.
The judgment of the Chancery Division is reversed and the cause remanded for a plenary trial in conformity with this opinion.
NOTES
[*] Every contract or agreement negotiated, awarded or made pursuant to this act shall contain a suitable warranty by the contractor that no person or selling agency has been employed or retained to solicit or secure such contract upon an agreement or understanding for a commission, percentage, brokerage or contingent fee, except bona fide employees or bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business, for the breach or violation of which warranty the State shall have the right to annul such contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage or contingent fee.