SAMUEL J. PLUMERI REALTY COMPANY, INC., A CORPORA-
TION, PLAINTIFF-RESPONDENT, v. CAPITAL PLACE URBAN
RENEWAL ASSOCIATES, INC., A CORPORATION; EUGENE
M. GRANT AND S. PIERRE BONAN, T/A CAPITAL PLACE
URBAN RENEWAL ASSOCIATES, DEFENDANTS, AND STATE
OF NEW JERSEY, DEFENDANT AND THIRD-PARTY CROSS-
CLAIMANT-APPELLANT, v. CAPITAL PLACE URBAN RE-
NEWAL ASSOCIATES, THIRD-PARTY DEFENDANT ON THE
CROSSCLAIM.

Argued April 22, 1985—Decided October 21, 1985.

14

*Eugene J. Sullivan,* Assistant Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney

General, of counsel; *Eugene J. Sullivan* and *Robert T. Lawless,* on the brief).

*Lewis J. Pepperman* argued the cause for respondent (*Stark and Stark,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This case arises out of an agreement by a developer to pay a commission to a real estate broker for procuring a lease with the State of New Jersey (the State) for a new office building. The narrow question is whether the agreement violates *N.J. S.A.* 52:34-15, which proscribes retaining persons on a commission basis "except bona fide employees or bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business * * *." The jury found, in answer to a specific interrogatory, that the broker had not been maintained by the owner, and returned a verdict for the State. In an unreported decision, the Appellate Division reversed and remanded for a new trial.

We granted the State's petition for certification, 99 *N.J.* 165 (1984), to determine whether the statutory requirement that the broker be "maintained by the contractor" was satisfied. We now find that the broker was not "maintained by" the developer, and, hence, that his commission violates *N.J.S.A.* 52:34-15. Accordingly, we reverse the judgment of the Appellate Division and reinstate the judgment entered on the jury verdict.

I

In 1954, Samuel J. Plumeri retired after twenty years' employment in the State Treasurer's Office and joined the family real estate business as a salesman. A lifelong resident of Trenton, he has been active for many years in local political and business affairs. At present, he is the president of plaintiff, Samuel J. Plumeri Realty Company, Inc.

The defendants include Capital Place Urban Renewal Associates, Inc. (Capital Place) and the State. Capital Place owns an office building located in downtown Trenton, two blocks from the State Capitol, and known generally as Capital Plaza Tower I (Capital Plaza). The State is the principal tenant in Capital Plaza.

Plumeri first learned of the possible development of Capital Plaza through news accounts in the 1960's. During this same period, Trenton retained the consulting firm of Gladstone Associates to study the development of the project. The "Gladstone Report," published in July 1971, concluded that if the project was to succeed, substantial office facilities would be required and that the State must be a principal tenant. Even before the release of the report, Plumeri met with another broker, Alvin H. Singer, to discuss the possibility of finding a developer. Also before the release of the report, Plumeri met with State Treasurer Joseph McCrane in an attempt to interest the State in leasing space in the project.

Plumeri was unsuccessful, however, in finding a developer until November 1971, when he met Eugene M. Grant, an experienced real estate developer, as well as a licensed lawyer and real estate broker in New York. Acting as an independent broker, Plumeri undertook to interest Grant in the project as a potential developer. Grant inspected the site with Plumeri, and on January 11, 1972 wrote to the Director of the Trenton Department of Planning and Development, expressing an interest in the project.

In February 1972, Plumeri introduced Grant at a meeting of the Mayor and Trenton City Council. Grant explained his proposal, and the following month, the City Council gave to Grant and Capital Place an exclusive four-month option to develop the site.

From the outset, Grant realized that for the project to succeed, the State must be the principal tenant, and he relied on Plumeri for access to the appropriate State officials. Accord-

ingly, Plumeri introduced Grant to James O'Connor, the Director of the State Division of Purchase and Property, which is part of the Department of the Treasury. This meeting, in turn, led to another meeting between Grant and McCrane. As a result of those meetings, O'Connor gave Grant a written commitment on September 21, 1972 that the State would lease office space in Grant's proposed building. Negotiations on the lease began that same month and continued late into 1973, when they ceased because of the forthcoming change from the Cahill to the Byrne administration.

On June 5, 1973, eighteen months after Plumeri first became involved with Grant, he and Capital Place entered into an agreement under which Plumeri would receive $346,666.65 as a commission on rents that Capital Place was to receive from the State. The agreement specifically provided that Plumeri's commission was contingent on the State leasing and commencing to pay rent for approximately 100,000 square feet of office space in Capital Plaza.

In early 1974, Grant renewed negotiations with the new administration, but Plumeri did not attend these sessions. After several negotiating sessions, the possibility of the payment of a commission to Plumeri was raised. Deputy State Treasurer Clifford Goldman, who took an active role in the negotiations, questioned Plumeri's right to a commission. On March 22, 1974, the then-Director of the Division of Purchase and Property, Frank M. Papale, Jr., wrote to Capital Place enclosing a proposed lease for Capital Plaza. In the letter, the Director explained that he had reduced the rent from $7.50 to $7.36 per square foot by eliminating Plumeri's commission, which appeared "to be violative of the provisions set forth in *N.J.S.A.* 52:34–15."

Five days later, at a March 27, 1974 meeting with State officials, Grant explained Plumeri's role, stating: "I wouldn't waste my time knocking on the doors of the State House. For

that you need brokers. Without Plumeri and Singer, I wouldn't have had knowledge of the project."

At trial, he amplified those remarks by stating: "An out-of-towner like all strangers are [sic] looked upon with suspicion when they come into another town; not necessarily in a parochial way, but it is just human nature, I would think, to have local representation in a business venture."

Although Plumeri did not participate in the negotiations with the State, he remained available to Grant. He attended City Council meetings on Grant's behalf as late as 1979, tried to procure other tenants, and placed on the site a sign that listed his corporation as the procuring broker.

The State and Capital Place entered into a twenty-five-year lease on September 12, 1975. Because of the ongoing dispute regarding Plumeri's commission, the lease provided that the commission be placed in escrow pending adjudication.

As anticipated, Plumeri sued Grant and the State to recover the commission. At the conclusion of the trial, the court submitted the following interrogatories to the jury:

(1) Did the State prove by a preponderance of the credible evidence that Plumeri did not earn his commission?

(2) Did the State prove by a preponderance of the credible evidence that Plumeri was not a bona fide established commercial or selling agency maintained by the developer for the purpose of securing business in addition to this one State lease?

The State objected to the second interrogatory on the ground that Plumeri was not entitled to a commission under any condition if Capital Place hired him solely because of his influence with State officials. In contrast, Plumeri had no objection to that interrogatory.

The jury concluded that Plumeri had earned his commission, but that he was not entitled to it because he was not "a bona fide established commercial or selling agency maintained by the developer for the purpose of securing business in addition to this one State lease." Based on the jury finding, the trial court entered judgment directing Capital Place to "return to the State

of New Jersey $223,999.00 (plus 5 per cent interest) and all other funds held in escrow regarding Plumeri's brokerage commission." In addition, the judgment ordered that the State's rental payments should be reduced by $5,333.33 for the next twenty-three quarterly payments.

Before the Appellate Division, plaintiff claimed that the second interrogatory constituted plain error. See *R.* 2:10-2. The Appellate Division agreed, reasoning that Plumeri was entitled to his commission absent proof that he had engaged in influence-peddling. On that hypothesis, the court concluded:

By adding a requirement of additional services, the second interrogatory could well have resulted in a misunderstanding of the whole case by the jury and possessed such a clear capacity to bring about an unjust result as requires reversal.

## II

The State's challenge concentrates on *N.J.S.A.* 52:34-15, which provides:

Every contract or agreement negotiated, awarded or made pursuant to this act shall contain a suitable warranty by the contractor that no person or selling agency has been employed or retained to solicit or secure such contract upon an agreement or understanding for a commission, percentage, brokerage or contingent fee, except bona fide employees or bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business, for the breach or violation of which warranty the State shall have the right to annul such contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage or contingent fee.

[footnote omitted.]

Chapter 34, in which the statute appears, pertains to State contracts in excess of $2500.00. Except as otherwise provided in the statute, such contracts are subject to public bidding. *N.J.S.A.* 52:34-6 to -8. One exception from the public bidding requirement is a State lease for office space. *N.J.S.A.* 52:34-9(c).

The only reported decision discussing *N.J.S.A.* 52:34-15 focuses not on whether the agent was "maintained" for the purpose of securing business, but on the good faith of the agency relationship. *State v. Arnold Constable Corp.,* 138

*N.J.Super.* 551 (App.Div.), certif. denied, 70 *N.J.* 518 (1976). In *Arnold Constable,* the State sought to recover a commission paid to real estate brokers who negotiated the State lease of an office building in Trenton. The State claimed that the property owners retained the brokers because of their influence with State officials. In granting summary judgment for the brokers, the Chancery Division found that the mere fact that they held real estate licenses was sufficient to establish the good faith of the brokers' relationship. The Appellate Division ruled, however, that the fact that the brokers were licensed was insufficient to establish, as a matter of law, that they were not employed to procure the lease because of their access to State officials. *Id.,* at 563. Because that determination could be made only after considering all relevant facts, the Appellate Division reversed and remanded the matter for trial.

As the *Arnold Constable* case indicates, when the State can prove that an agent was employed solely because of his or her ability to gain access to State officials, a contingent commission is impermissible. *Id.* As indicated, however, the *Arnold Constable* case does not discuss the question on the present appeal, whether in the absence of such proof, the statutory proscription applies to a broker who is retained to procure a State contract in a solitary transaction.

In urging this appeal, the State does not challenge the amount of the commission or the jury finding that Plumeri had earned the commission. Furthermore, the State acknowledges that if he were a private party, Plumeri's commission would be permissible. Nonetheless, the State contends that the statute directs that no contingent commission may be paid to a real estate broker who negotiates a State lease in an isolated deal. That contention is predicated on the statutory ban on contingent commissions except when earned by a broker who is "maintained" by the contractor.

Thus, the critical question becomes whether Capital Place "maintained" Plumeri as a broker. The statute does not define

"maintained," and the legislative history sheds no light on the word's meaning. Similarly, the State has not promulgated any regulations defining the term. Even before the enactment of the statute, however, New Jersey courts disallowed the payment of contingent fees as against public policy when a government contract either was the product of improper influence or had a tendency to corrupt. *Stone v. William Steinen Mfg. Co.,* 22 *N.J.Misc.* 353 (Cir.Ct.1944), *aff'd,* 133 *N.J.L.* 16 (Sup.Ct.1945), *aff'd,* 133 *N.J.L.* 593 (E. & A.1946); *Davidson v. Button Corp. of America,* 137 *N.J.Eq.* 357, 361–62 (Ch.1945), *aff'd,* 138 *N.J.Eq.* 113 (E. & A.1946).

Although no New Jersey case has interpreted "maintained" in *N.J.S.A.* 52:34–15, the federal courts have interpreted that word in a virtually identical federal statute, 41 *U.S.C.* § 254(a). As Judge Learned Hand stated, to be entitled to a contingent commission, an agent must be "employed generally to drum up business for the contractor * * *." *Reynolds v. Goodwin-Hill Corp.,* 154 *F.*2d 553, 555 (2d Cir.1946). Stated otherwise, the use of "maintained" suggests a legislative intention to restrict the exception allowing a contingent commission to an agent who has a continuing relationship with a contractor. *United States v. Paddock,* 178 *F.*2d 394, 395–96 (5th Cir.1949), *reh'g denied,* 180 *F.*2d 121 (5th Cir.1950); *Bradley v. American Radiator & Standard Sanitary Corp.,* 159 *F.*2d 39, 41 (2d Cir.1947). With respect to a newly-formed agency relationship, continuity may be established through the parties' intent to engage in a future course of dealing. *See* 41 *C.F.R.* § 1–1.504–05(b)(3). A contingent commission is not allowable if the agent is retained "with respect to one isolated instance, without any past or contemplated future employment," *Weitzel v. Brown-Neil Corp.,* 152 *F.Supp.* 540, 549 (N.D.W.Va.1957), *aff'd,* 251 *F.*2d 661 (4th Cir.1958), or if the parties "had never before had any commercial dealings," *Quinn v. Gulf & Western Corp.,* 644 *F.*2d 89, 93 (2d Cir.1981).

We likewise conclude that *N.J.S.A.* 52:34–15 requires a broker seeking a contingent commission to demonstrate some continuity in his or her relationship with the contractor. Continuity may be established through a prior relationship or through an intent to engage in a future course of dealings. In the present case, Grant had not employed Plumeri in the past and expressed no intention to employ him in the future. By Grant's own admission, the only reason that he retained Plumeri was to open the doors to the State House for this solitary transaction. The mere fact that Plumeri sought out other tenants and performed other services is not sufficient to save his commission on the State lease. Any such other leases and services were incidental to the main reason Capital Place retained Plumeri, to procure the State as a tenant.

From that perspective, the challenged jury interrogatory passes the plain error test. The question directed the jury's attention to determining whether Grant maintained Plumeri for the purpose of securing business in addition to the challenged lease.

We are aware that real estate brokers generally work on a contingent-commission basis. In this regard, the State concedes that if an owner regularly employs an agent on such a basis, the agent ordinarily could receive a commission. We recognize further that our holding may preclude the receipt of a commission on a State lease when such a commission would be permissible on a private lease. Although the denial of a commission in such a case may seem harsh, the statute serves a legitimate legislative purpose in forestalling influence peddling by requiring that the contractor maintain the broker.

The judgment of the Appellate Division is reversed, and the judgment entered on the jury verdict is reinstated.

CLIFFORD, GARIBALDI and STEIN, JJ., dissenting.

Today this Court in effect overrules *State v. Arnold Constable Corp.*, 138 *N.J.Super.* 551 (App.Div.), certif. denied, 70

*N.J.* 518 (1976). That case stands for the proposition that the question of whether a broker should be denied his commission

is to be resolved by weighing all of the elements involved and then deciding whether the inherent tendency of the agreement is to invite or promote the use of corrupt means to accomplish the end or to bring influences to bear upon public officials which are improper. [*Id.* at 563.]

The guiding principle, followed in *Arnold Constable* but cast aside here, is found in *Stone v. William Steinen Mfg. Co.*, 22 *N.J.Misc.* 353 (Cir.Ct.1944), *aff'd*, 133 *N.J.L.* 16 (Sup.Ct.1945), *aff'd*, 133 *N.J.L.* 593 (E. & A.1946), decided before the enactment of the pertinent public-contracts statute, *N.J.S.A.* 52:34-15. In *Stone* the court stated:

The question of the legality of the contract in each case is to be determined by weighing all the elements involved and then deciding whether its inherent tendency is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government. If such is its tendency, it must be pronounced illegal. If that point is open to fair doubt upon all the evidence, its purpose must be left to the jury under appropriate instructions.

[22 *N.J.Misc.* at 363 (quoting *Noble v. Mead-Morrison Mfg. Co.*, 237 *Mass.* 5, 129 *N.E.* 669, 674 (1921).]

If we resort to the foregoing relevant factors, it is made abundantly clear by this record that Plumeri was no influence peddler. Indeed, he was the party primarily responsible for the entire development. It was through his efforts, far beyond the mere arranging of the lease of the property to the State, that the project took form. Plumeri introduced Grant, the developer, to the property. It was Plumeri who was instrumental in obtaining the necessary approvals from the Trenton City Council, thereby giving life to the project.

Even under the *per se* rule established by the majority opinion, the award of a commission to Plumeri is not incompatible with the statute. There is no evidence that Plumeri was hired for the "sole" purpose of securing the state lease. In fact, the record contains ample evidence to the opposite effect. Plumeri's introduction of Grant to the project was the commencement of a business relationship that extended over sever-

al years (not an unusual occurrence in a real-estate development project). The project consisted of several discrete stages: the initial introduction of Grant to the project, the securing of the necessary building permits, and finally the leasing of the property to a substantial tenant, not necessarily the State. Plumeri's role in securing the state lease was but a minor one in comparison to his other contributions to the development.

As we understand the course by which the case came to us, it centers on an interrogatory submitted to the jury, see *ante* at 18, which the Appellate Division determined amounted to plain error in its prejudicial effect on the broker. We agree. The better approach before denying a broker a substantial commission that may be vital to his livelihood and well-being is to focus jury attention on the relevant factors, as adverted to above, and to weigh them in light of the purposes of the statute itself. The interrogatory diverted attention from that focus. We would therefore affirm, to the end that the case be retried with proper instructions to the jury.

*For reversal* —Chief Justice WILENTZ and Justices HANDLER, POLLOCK and O'HERN—4.

*For affirmance* —Justices CLIFFORD, GARIBALDI and STEIN—3.